```
1                    IN THE UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF WEST VIRGINIA
2                                AT CHARLESTON

3      ------------------------------x
                                      :
4      UNITED STATES OF AMERICA,      :
                                      :
5           v.                        :   CRIMINAL NO. 2:08-00105
                                      :
6      WILLIAM S. CHESTER, JR.        :   JULY 15, 2011
                                      :
7              Defendant.             :
       ------------------------------x
8

9                        TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE JOHN T. COPENHAVER, JR.
10                     UNITED STATES DISTRICT JUDGE

11     APPEARANCES:

12     FOR THE UNITED STATES:      AUSA LISA JOHNSTON
                                   U.S. Attorney's Office
13                                 P.O. Box 1713
                                   Charleston, WV  25336
14

15     FOR THE DEFENDANT:          AFPD EDWARD WEIS
                                   Federal Public Defender's Office
16                                 300 Virginia Street East
                                   Charleston, WV  25301
17

18

19     COURT REPORTER:            BARBARA STEINKE, RMR
                                   Post Office Box 75025
20                                 Charleston, WV  25375
                                   (304) 347-3151
21
       These proceedings were reported with use of a stenographic
22     machine and transcribed with use of computer-aided
       transcription.
23

24

25
```

United States v. William Chester                    17

1                    P R O C E E D I N G S            3:13 p.m.

2          THE CLERK:  The case before the court this afternoon is

3   *United States versus William Samuel Chester*, Criminal Action No.

4   2:08-00105.  Would counsel please rise and note their

5   appearances for the record.

6          MS. JOHNSTON:  Lisa Johnston on behalf of the United

7   States, Your Honor.  Seated at counsel table with me today is

8   Ms. Rosemary Logan.  She will be a third year law student at

9   William & Mary Law School.  And also is Deputy Humphreys.  He is

10  employed with the Kanawha County Sheriff's Department.

11         THE COURT:  Thank you.

12         MR. WEIS:  Edward Weis on behalf of William Samuel

13  Chester.  Mr. Chester is seated to my right.

14         THE COURT:  Thank you.

15         THE CLERK:  Mr. Chester, would you please rise and

16  raise your right hand to be sworn.

17    (The defendant was sworn.)

18         THE COURT:  This matter is before the court to receive

19  further evidence pertinent to the issues remaining to be

20  resolved, and I would ask whether or not there has been any

21  agreement with -- among the parties with regard to any of the

22  evidence; and if so, you could state that now.

23         MR. WEIS:  Your Honor, after the conclusion of the last

24  hearing, I had several discussions with my client.  As a result

25  of those discussions, Mr. Chester is willing to stipulate to the

1   facts of the assault against Meghan as set forth in the police

2   report which I understand is part of the record.  Since the

3   police report was prepared, I received in discovery an

4   additional written part of the investigation which includes a

5   statement -- I guess a transcript of the statement by Meghan

6   Chester.  We would not object to that being included in the

7   record also.

8           THE COURT:  All right.  Just one moment.

9       Is the police report to which reference is made an item that

10  was appended to the criminal complaint that was filed in

11  magistrate court in Kanawha County, West Virginia, apparently

12  under the magistrate's signature, date, the magistrate seeming

13  to be Carol Fouty, that date being April 26, 2004?

14          MR. WEIS:  That is correct, Your Honor.

15          THE COURT:  And the police report to which you refer is

16  a one-page report in all capital letters?

17          MR. WEIS:  Yes, Your Honor.

18          THE COURT:  Thank you.

19      In addition, you indicated that one other item had been

20  agreed upon, and what is that again, please?

21          MR. WEIS:  Your Honor, I received from the government

22  additional material in the discovery of this case, and that

23  included a written statement by Meghan Chester which we agree

24  may be made part of the record.

25          THE COURT:  All right.  Is that part of the court file

1    or simply part of the government's file?

2              MS. JOHNSTON:  Your Honor, it's my understanding it is

3    not a part of the court file yet.  If we were going to present

4    evidence today, I intended to introduce that evidence through

5    the officer, but if Mr. Weis is willing to agree that could be

6    made a part of the record, I have an extra copy for the court.

7    It may have an exhibit number on it is my problem, Your Honor.

8              THE COURT:  Well, can you just put a number over that

9    number?

10             MS. JOHNSTON:  I can, Your Honor.

11             THE COURT:  And then with regard to the first item

12   referred to, is it to be offered up also or are we simply to

13   treat what is apparently already in the court's record to cover

14   the police officer's statement relative to the Meghan matter?

15             MS. JOHNSTON:  Well, Your Honor, that document that

16   Mr. Weis is referring to, the court is referring to, I

17   discovered that that was made a part of the district court

18   record.  It was filed as document 22-1.  It was filed with the

19   district court on July 29th of 2008.  And I think, Your Honor,

20   it was attached to a response of the United States that we had

21   filed.  So that's already a part of the district court record.

22             THE COURT:  All right.  That's fine.  And so, you'll be

23   offering up via stipulation then this next item which is first

24   referred to by Mr. Weis, and do you want to put a number on it?

25             MS. JOHNSTON:  I can, Your Honor.

1          MR. WEIS:  As far as I'm concerned, it can be court's

2    exhibit 1.  It's not important what the number is.

3          THE COURT:  Again, please?

4          MR. WEIS:  As far as I'm concerned, it can be court's

5    exhibit 1.

6          THE COURT:  All right.  That's what we'll do.  Does

7    someone want to furnish it and we'll so mark it?

8       And I take it that's admitted by agreement.

9          MS. JOHNSTON:  Yes, Your Honor.

10         MR. WEIS:  Yes, Your Honor.

11         THE COURT:  Labeled court exhibit 1.

12      (Court's exhibit 1 was admitted.)

13         THE COURT:  And anything further, Mr. Weis?

14         MR. WEIS:  No, Your Honor.

15         THE COURT:  Does the government have any suggestion as

16   to matters of agreement?

17         MS. JOHNSTON:  Well, Your Honor, at the last hearing, I

18   mean, the issue was whether or not Mr. Chester would agree to

19   the -- to I think basically the way Judge Davis had written his

20   concurring opinion as to the facts regarding that domestic

21   violence incident.  I believe that was kind of where we left it.

22   Now it appears as though Mr. Chester is agreeing to the way it

23   was written in that Fourth Circuit opinion.  I think the

24   narrative that's been introduced that was already a part of the

25   record supports Judge Davis's description of what happened on

1    April 26th, 2004.  Now we have also included as part of the

2    record Ms. Chester, Meghan Chester's statement she gave to the

3    police regarding that.  So I think now there is sufficient

4    evidence with regard to the April 26, 2004, domestic violence

5    incident involving the defendant in this case.

6        However, if the court so desires, the government is prepared

7    to present additional evidence if the court believes that that's

8    necessary in making a decision in this case regarding the

9    constitutionality of the statute.

10        THE COURT:  It seems to me that it's appropriate only

11   if that which would be presented goes beyond that which is set

12   forth in the police officer's report that the court now has

13   before it and the statement of Meghan that has just been offered

14   and admitted into evidence.  And so, if the government is

15   satisfied that that covers the whole of it, then I see no need

16   for testimony, but I leave that to the judgment of the parties.

17        MS. JOHNSTON:  Well, Your Honor, I think it kind of

18   depends on Mr. Weis in some respects.  We had a -- I won't speak

19   for Mr. Weis.  We had a discussion about some additional

20   evidence he may or may not want to argue before the court about

21   Mr. Chester's involvement after his conviction.  My response to

22   that was I thought the court already ruled that that evidence

23   was immaterial to the issue before the court today.  As you may

24   recall, Mr. Weis had asked the court to consider some additional

25   facts in the presentence report regarding Mr. Chester's -- how

1    he is doing on bond and he hasn't gotten in any trouble since

2    that time.

3        So if that's the case, if Mr. Weis wants to argue that to

4    the court today or present that evidence, then I think it's

5    important for the government to be able to respond to that.

6    That's one issue, Your Honor.

7        The second issue is -- I mean, if I were to call witnesses

8    today, in addition to the evidence that's in the record now

9    regarding the 2004, I would present evidence, I'll proffer just

10   generally, that Mr. Chester did in fact threaten someone with --

11   actually his wife with a firearm.  So, I mean, that's just a

12   proffer to the court.  Obviously it's not been testified under

13   oath at this point, but that's something that the government

14   would be willing to or could present today if the court thinks

15   that's important for the issue that's before the court.

16          THE COURT:  I would think it would be appropriate.  I

17   would ask you, however, the date of the event to which you are

18   referring.

19          MS. JOHNSTON:  Your Honor, it would be throughout the

20   course of the marriage between --

21          THE COURT:  Well then, it's more general in nature

22   then, although there may have been specific instances, so I'll

23   simply await whatever evidence you have to offer with respect to

24   it.

25       I did want to ask whether or not there is any further

1   evidence to be presented with regard to the second domestic

2   battery in I suppose 2007.  Does the court have a full record on

3   that?

4          MS. JOHNSTON:  Your Honor, if I may just back up to

5   2004 for just one second, I apologize.  One thing, the

6   government does have photographs that were taken that are not a

7   part of the record of the victim in that case.  Mr. Weis has

8   copies of those photographs.  We haven't discussed whether or

9   not he would be willing to allow those to be made a part of the

10  court record as well.

11         MR. WEIS:  I will -- I will not object to their being

12  admitted without testimony.

13         THE COURT:  Well, suppose the parties just gather that

14  evidence -- that additional evidence to which reference is being

15  made, and to the extent it's documentary, then it can be handed

16  up now to the extent that the parties are in agreement.

17         MS. JOHNSTON:  Thank you, Your Honor.  I apologize.  I

18  previously marked them as government's exhibits.  Perhaps we

19  could just put court exhibits, and I guess it would be number 2,

20  5, and 6, I believe.

21         THE COURT:  However the parties want to do it.

22         MS. JOHNSTON:  May I approach, Your Honor?

23         THE COURT:  Sure.

24         MS. JOHNSTON:  Thank you, Your Honor.

25      Your Honor, I believe that's all the evidence that the

1    government would have to offer with regard to the 2004 domestic

2    violence incident.

3             MR. WEIS:  Your Honor, Ms. Johnston mentioned three

4    areas of evidence and I'm willing to bring in a fourth.  I think

5    as to the 2004 assault on Meghan Chester, that that does

6    complete the record and there's no need for any further

7    evidence.  I did not intend to introduce any evidence as to the

8    facts of that assault.

9        As to the proffered evidence which we discussed very briefly

10   at the last hearing, and that has to do with Mr. Chester's

11   current and future situation, the things which I argued in my

12   memoranda concerning his ceasing being a drug and alcohol

13   abuser, the relationship, the fact I think indeed things have

14   changed greatly, I do intend to present or would seek to present

15   the evidence of Fran Jackson, his current partner, and also

16   Millie DeVore who is supervising him on supervised release.

17       I believe that that is relevant, again for the reasons I

18   said in my memorandum which is by analogy to Trust -- New York

19   College, I believe, Trustees versus Fox, about how the students

20   in that case would have had standing to challenge the

21   overbreadth of regulations which were primarily, but not

22   exclusively, directed to commercial speech on an overbreadth

23   nature because of the -- their right to complain about a First

24   Amendment violation since the regulations did include that which

25   was -- that which would be subject to higher scrutiny; that is,

1    not just commercial speech, but fully protected First Amendment

2    speech.

3        I would seek to present evidence.  I think it's relevant to

4    that standing kind of an issue.  Again, I did argue that in my

5    previously submitted memoranda.

6        The next question is the evidence concerning whether or not

7    Mr. Chester ever threatened Linda Guerrant with a gun.  That is

8    something as to which there is no agreement.

9        And, finally, the government has sought to introduce as

10   evidence three additional studies, and at some point I would

11   like to make comment on that.

12           THE COURT:  Yes, we can put the studies in a separate

13   category for consideration today.  And let me see just one

14   moment those additional exhibits that were just handed up.

15       I understand court exhibit 1 to be the statement of Meghan

16   Lee Chester, earlier referred to in this hearing.  Court exhibit

17   number 2 is a collection of five photographs of Meghan, as I

18   understand it, following the 2004 event.  Beyond that, all of

19   which is admitted into evidence, what further evidence, if any,

20   is to be presented with regard to the 2007 incident?

21       (Court exhibit 2 was admitted.)

22           MS. JOHNSTON:  Your Honor, the United States does not

23   have any other evidence with regard to that.  It was my

24   understanding that Mr. Chester wasn't disputing any of the facts

25   that are in the record regarding the 2007 domestic violence

1   incident.

2          MR. WEIS:  That is correct.  We did not dispute it at

3   the prior hearing and we do not now.

4          THE COURT:  Is that event adequately set forth in the

5   presentence report at page 4?

6          MR. WEIS:  Yes, Your Honor.

7          THE COURT:  That's under the category of the offense

8   conduct and consists of paragraphs 7 through 11.

9          MR. WEIS:  Yes, Your Honor.

10          THE COURT:  Ms. Johnston, are you reviewing that

11   material?

12          MS. JOHNSTON:  Your Honor, I thought there was no

13   objection to that.  I apologize.

14          THE COURT:  And so, it's agreed then that the court may

15   consider that to which I've just referred.

16          MS. JOHNSTON:  Yes, Your Honor.

17          THE COURT:  Thank you.

18      Now then, what further evidence does the United States have

19   to present?

20          MS. JOHNSTON:  Your Honor, we -- we have --

21          THE COURT:  And, incidentally, I'm leaving to the side

22   for the moment the articles.

23          MS. JOHNSTON:  Okay, Your Honor.  I would like to

24   respond to Mr. Weis's two witnesses at some point, but I'll

25   answer the court's question, first of all, and that is, that the

```
 1   United States would call Ms. Linda Guerrant to testify regarding
 2   the defendant's threatening her with a firearm on other
 3   occasions, and Mr. Chester's daughter, Meghan, I think would be
 4   called to testify with regard to what she witnessed in that same
 5   regard.
 6               THE COURT:  If you would proceed, please.
 7               MS. JOHNSTON:  Thank you.
 8               MR. WEIS:  Your Honor, I move for sequestration of
 9   witnesses.
10               THE COURT:  I take it there is no objection.
11               MS. JOHNSTON:  Absolutely not, Your Honor.
12               THE COURT:  Let me note and for the benefit of those in
13   the audience, it may be well that the parties designate whom
14   they expect to call because it may be that not everybody who was
15   brought to testify is expected to be called.  And so, that said,
16   I would simply note that any witness or potential witness in
17   this matter, other than those set forth at counsel table, are to
18   be excused while the testimony is received, except for the
19   witness testifying.  And, of course, the witness testifying is
20   not to disclose that witness' testimony to any other potential
21   witness in the case until this hearing is over.
22       And so, with that, I'll leave it to counsel for the parties
23   to police the court's order of sequestration.
24               MR. WEIS:  May I explain it to my two witnesses?
25               MS. JOHNSTON:  I will as well, Your Honor.
```

1          Thank you, Your Honor.  The United States calls Linda

2     Guerrant.

3               THE CLERK:  Ms. Guerrant, will you step up here to be

4     sworn, please.

5               THE WITNESS:  Yes.

6          **LINDA GUERRANT CHESTER, UNITED STATES WITNESS, SWORN**

7               THE COURT:  Thank you, Ms. Guerrant.  If you would pull

8     that microphone, the base of it, as close to you as you can get

9     it.

10              THE WITNESS:  Okay, thank you.

11              THE COURT:  Thank you.

12                        **DIRECT EXAMINATION**

13    **BY MS. JOHNSTON:**

14    Q.  Please state your name for the record.

15    A.  Linda Victoria Guerrant Chester.

16    Q.  What is your educational background?

17    A.  I have a master's degree in special education and I work in

18    counseling, University of Wisconsin, Madison, and my master's

19    degree is from what used to be COGS, but it's now Marshall

20    University.

21    Q.  Ms. Guerrant, are you -- are you presently retired?

22    A.  Yes, retired, disabled retired from Kanawha County schools.

23    Q.  Can you lean up just a little bit?  I'm sorry.  Thank you.

24    I'm sorry, where were you employed?

25    A.  Kanawha County schools.

1   Q.  And how long were you employed there?

2   A.  From 1974 to 2002.

3   Q.  And what position did you hold there?

4   A.  I was a teacher.

5   Q.  What happened in 2002?

6   A.  I had a stroke.

7   Q.  And was it a severe stroke?

8   A.  Yes, I was disabled because of it.

9   Q.  And is that what caused you to have to retire?

10  A.  Yes.

11  Q.  Did you go through some physical therapy and rehabilitation

12  after your stroke?

13  A.  I did.

14  Q.  Are you doing much better now?

15  A.  I am.  I still do physical therapy, yes.

16  Q.  Ms. Guerrant, are you presently taking any medication?

17  A.  Yes.

18  Q.  And can you tell the court what type of medication you are

19  taking?

20  A.  Neurontin and medication for depression and -- just for my

21  stroke and depression, and I take medication for -- because I

22  have low blood, things like that.

23  Q.  Ms. Guerrant, I'm going to just go through.  You indicated

24  some medications and I want to make sure that the court is aware

25  of all the medications that you are taking.

Linda Guerrant – Direct by Ms. Johnston                30

1    A.  That's fine, yes.  You have them written down.

2    Q.  Are you taking -- I may mispronounce them, but is it Toprox?

3    A.  Toprol, high blood pressure.

4    Q.  How often do you take that?

5    A.  Once a day.

6    Q.  Why do you take that?

7    A.  For high blood pressure.

8    Q.  Okay.  And Topamax?

9    A.  Topamax, it's for -- because of the depression.

10   Q.  How often do you take that?

11   A.  Twice a day.

12   Q.  And Neurontin, do you take that?

13   A.  That's because of my stroke.  I have sharp pain on the left

14   side where I had my stroke.  That's the part that's involved

15   from the stroke.

16   Q.  How often?

17   A.  I take two three times a day, 3:00, 6:00, 9:00, 3:00

18   o'clock, 9:00 o'clock -- at 9:00 o'clock, 3:00 o'clock, and 9:00

19   o'clock at night.

20   Q.  Do you also take Ambien?

21   A.  As needed.  I haven't had to take it for a long time.

22   Q.  And do you take -- is it Cymbalta?

23   A.  Cymbalta, twice a day.

24   Q.  And what is that for?

25   A.  Depression.

1    Q.  And do you take any other medication to regulate your

2    cholesterol level?

3    A.  Yes, I take it once a day.

4    Q.  Now, do you understand that what is going on here, are you

5    able to testify truthfully here today?

6    A.  Yes.  Yes.  I used to take quite a bit of more medication,

7    but since I've gotten straightened out with my husband, I've

8    been taken off quite a bit of the medication and those are the

9    only ones that I take now.

10   Q.  Ms. Guerrant, when you had your stroke, did it impair your

11   short-term or long-term memory?

12   A.  Yes, it did.

13   Q.  But you still have a recollection of some events that

14   occurred --

15   A.  I do.

16   Q.  -- easily?

17   A.  I do.  I am much better now.  I'm functioning much better

18   since I have been taken off all of the medications that I was on

19   previously.

20   Q.  Ms. Guerrant, are you familiar with the defendant in this

21   case, William Samuel Chester, Jr.?

22   A.  I am.

23   Q.  Do you see him in the courtroom here today?

24   A.  I do.

25   Q.  Can you tell the court where he is sitting and what he is

Linda Guerrant – Direct by Ms. Johnston                    32

1   wearing?

2   A.  A black suit with a white shirt, and he is sitting there

3   (pointed) behind you.

4        MS. JOHNSTON:  And may the record reflect, Your Honor,

5   that she has identified the defendant?

6        MR. WEIS:  No objection.

7        THE COURT:  The record may so indicate.

8        MS. JOHNSTON:  Thank you.

9   Q.  Ms. Guerrant, does the defendant go by any other name or

10  does he have a nickname?

11  A.  Bo.

12  Q.  How is it that you are familiar with Mr. Chester?

13  A.  I'm still married to him.

14  Q.  How long have you been married to Mr. Chester?

15  A.  For about thirty-two years now.

16  Q.  Have you filed --

17  A.  Have I filed for a divorce?  Yes.

18  Q.  Is that divorce still pending?

19  A.  Yes.

20  Q.  Can you tell the court approximately when you filed for

21  divorce?

22  A.  In '07 -- no, let's see.  Yes, I think.

23  Q.  Was it shortly after the 2007 domestic violence incident?

24  A.  It was.

25  Q.  Do you and Mr. Chester have any children?

Linda Guerrant - Direct by Ms. Johnston                 33

1    A.  We have three that are -- yes.  We had four.  One passed

2    away, crib death.

3    Q.  Are your three children all daughters?

4    A.  Yes.

5    Q.  And is Meghan one of the daughters?

6    A.  She is.

7    Q.  Ms. Guerrant, during the course of your marriage with the

8    defendant, was he ever mentally abusive to you?

9    A.  He -- he was, yes, quite frequently, mentally and physically

10   abusive.

11   Q.  And when you say mentally abusive, can you just tell the

12   court what you are referring to or something that he said that

13   leads you to conclude that?

14   A.  He just constantly called names and played games, stayed

15   gone all the time, was never cooperative, never very

16   communicative at all.  We just never seemed to get along.  He

17   never helped out.  We were just never together.  We were never

18   physical.  We didn't have a relationship as man and wife, not

19   throughout our whole marriage, not at all.  For the last

20   twenty -- let's see, the last years of our marriage, we were

21   never physical at all.  We never had a physical relationship,

22   not at all.

23   Q.  Was he also physically abusive toward you during your

24   marriage?

25   A.  Yes, he was.

1    Q.  And what do you mean when you say that?

2    A.  He was always hitting.  There was always weapons in the

3    house.  He was always physical.

4    Q.  Did he ever threaten to kill you?

5    A.  Yes.

6    Q.  And can you tell the court approximately how many times he

7    threatened to kill you?

8    A.  At least three.

9    Q.  And can you tell us --

10   A.  I remember a time when his sister Grace had to come and take

11   a gun from him, and she kept it at her house.  I do remember

12   that time distinctly.

13   Q.  Ms. Guerrant, can you tell the court, if you recall,

14   approximately when that occurred?

15   A.  I guess it must have been at least maybe ten, twelve years

16   ago, maybe fifteen years ago, yes.  She took a gun from him and

17   kept it at her house.

18   Q.  Has he ever threatened to use one of the firearms to harm

19   you?

20   A.  Yes.  Yes.

21   Q.  And, I mean, how many times did he do that?

22   A.  I would say at least twice.

23   Q.  And do you recall approximately when he did that?

24   A.  I don't recall, no.  I can't give you a specific date.

25   Q.  Are you afraid of him?

1  A.  Yes, I am.  I was really afraid of him.

2  Q.  When Mr. Chester threatened to shoot you or harm you with a

3  firearm, were you scared?

4  A.  Yes.

5  Q.  Other than the 2007 incident which the court is aware of,

6  did you ever call the police to report any of these domestic

7  violence incidents?

8  A.  No, I haven't called the police, no.  Other than that, I

9  can't remember ever calling the police on him, no.  I probably

10  should have, but I haven't.

11  Q.  Why didn't you?

12  A.  I don't have a reason for that.  I just haven't called the

13  police on him, no.  He has always left in a huff and been gone

14  and stayed away and came back, but there have been times when we

15  had arguments and he will leave for a period of time and come

16  back, but I've never called the police on him.

17  Q.  During the course of your marriage, was Mr. Chester mentally

18  abusive to his three daughters?

19  A.  I read a letter -- yeah, he -- he has mentally -- I can't

20  say that he has been mentally abusive to the girls.  He just

21  goes without talking and being mean like that.

22  Q.  During the course of your marriage, do you think he had a

23  drinking problem?

24  A.  Yes.

25  Q.  And what do you base that on?

1    A.  Staying drunk all the time or being high all the time, for

2    long periods of time.

3    Q.  Did you witness him drink during the marriage?

4    A.  Yes.

5    Q.  How often would he drink?

6    A.  Almost every day.

7    Q.  And how much would he drink, if you know?

8    A.  I can't -- a lot.  I don't know.  I can't say how much, but

9    he stayed drunk a lot.

10   Q.  Now, you mentioned that he was high.  What were you

11   referring to when you said that?

12   A.  Reefer.

13   Q.  Is that marijuana?

14   A.  Weed, marijuana.

15   Q.  And how often would he smoke marijuana?

16   A.  As often as he could get it.

17   Q.  Is this during most of the years that you were married?

18   A.  Most of the time that we were married.  All of the time that

19   we were married, yes.

20   Q.  Miss Guerrant, did you also drink alcohol when you were

21   married to him?

22   A.  Yes, I did.

23   Q.  And did you consider yourself that you had a problem?

24   A.  I had a problem, yes, I did.

25   Q.  Did you seek --

Linda Guerrant - Direct by Ms. Johnston                    37

1    A.  Yes, I got help.

2    Q.  -- seek help?

3    A.  Yes, I got help, I got help, and it was only after he left,

4    but I got help before it stopped, but it was only when I got out

5    of the situation and he was gone that -- but before, you know, I

6    drank a lot, but it was only after he was gone that I realized

7    it was over, really over, and when I -- it was just too much to

8    handle, but it was stress, and I'm not making excuses, but I

9    drank a lot, but I got help for mine.

10   Q.  Ms. Guerrant, you were home on April 26 of 2004; is that

11   correct?

12   A.  Yes.

13   Q.  Were you present then when the domestic violence incident

14   occurred between your daughter and Meghan and the defendant?

15   A.  Yes, I was -- I don't know how it started or what it was all

16   about, but I was there to break it up and I witnessed part of

17   the -- when I went in to -- to try to break it up and I was

18   there to break it up when Meghan was standing in the corner in

19   the kitchen, that part of it, but I don't know how it got

20   started or what it was all about.

21   Q.  Was Meghan bleeding at the time if you know?

22   A.  Yes.

23   Q.  Did you get any blood on your clothing?

24   A.  I did.

25   Q.  Did you take Meghan to the hospital after the incident?

1    A.  I called my girlfriend and we took her to the hospital.  She

2    drove with me to take Meghan to the hospital.

3            MS. JOHNSTON:  With regard –– Your Honor, just for the

4    record, I don't intend to ask Ms. Guerrant any specific

5    questions with regard to the 2004 domestic violence incident

6    because I think all those facts are in the record at this time.

7        And also with regard to the 2007 domestic violence incident

8    regarding Ms. Guerrant, I think all the facts are in the record.

9    So unless the court feels it necessary to ask the witness, I

10   don't intend to ask the witness any of those facts as well.

11       So those are all the questions, Your Honor, I have of this

12   witness.

13           MR. WEIS:  Your Honor, may we have a moment?

14           THE COURT:  Yes, sir.

15           MR. WEIS:  Thank you.

16                        **CROSS–EXAMINATION**

17   **BY MR. WEIS:**

18   Q.  Ms. Guerrant ––

19   A.  Yes.

20   Q.  –– after your husband was arrested for the guns, the two of

21   you separated; isn't that correct?

22   A.  Yes.

23   Q.  And it was at that time that you filed for divorce?

24   A.  Yes.

25   Q.  And you each had attorneys to deal with the divorce; isn't

Linda Guerrant - Cross by Mr. Weis                    39

1   that correct?

2   A.  Yes.

3   Q.  And he did not live with you -- hasn't lived with you since,

4   has he?

5   A.  No.

6   Q.  And he went away to prison for a period of time, didn't he?

7   A.  Yes.

8   Q.  And he has been -- you were aware of when he was going to be

9   released; isn't that right?

10  A.  Yes.  Yes.  I haven't -- yes, I knew when he was out of

11  jail.

12  Q.  Okay.  And throughout the period of time that I'm speaking

13  about, except in connection with the divorce proceedings, the

14  two of you haven't had anything to do with one another, have

15  you?

16  A.  I have not, no.

17  Q.  He doesn't call you or come over or try to visit you, does

18  he?

19  A.  Of course not, and I not him either.

20  Q.  Right.  And one of his sisters lives real close to you;

21  isn't that right?

22  A.  Across the street.

23  Q.  And he comes and visits her, but he never comes and tries to

24  see you; isn't that right?

25  A.  Does he what now?

1   Q.  He comes to see his sister, doesn't he?

2   A.  Yes.

3   Q.  And he does not try to come to see you when he comes to see

4   his sister, does he?

5   A.  Of course not.

6   Q.  So the two of you have been completely separate since this

7   incident, except perhaps through your attorneys for the divorce

8   litigation; isn't that right?

9   A.  Yes.

10  Q.  Up to the time you separated, you were taking quite a bit of

11  medicine for your depression --

12  A.  Right.

13  Q.  -- isn't that correct?  As a matter of fact, you were being

14  treated for depression -- your treatment for depression predated

15  your stroke; is that correct?

16  A.  Yes.

17  Q.  And I know this isn't very pleasant, but is it fair to say

18  that about the one thing that the two of you did together in the

19  last years of the marriage was drink?

20  A.  Yes.

21  Q.  So you were taking alcohol along with the antidepression

22  medicine.

23  A.  No.  When I was drinking, I wasn't taking medication.

24  Q.  So you used the alcohol to substitute for the medication.

25  A.  Yes.

1   Q.  The stroke required that you stop working and go on

2   disability.

3   A.  Yes.

4   Q.  And the stroke affected your brain obviously; isn't that

5   correct?

6   A.  The stroke affected my brain.

7   Q.  And it affected your memory.

8   A.  Yes.

9   Q.  So you don't have any clear recollection of any of the

10  alleged incidents where Mr. Chester threatened you; isn't that

11  correct?

12  A.  No, that isn't correct.  I have clear memory and written

13  memory in my diary of everything that I have told him -- said

14  and done, and I have very clear memory of what Mr. Chester did

15  to me.  It is not clouded by my stroke, nor by alcohol or by

16  drugs that I have taken then or now.  It is very clear in my

17  mind and everything that I know about it.  It is not clouded by

18  drugs, alcohol, stroke, or anything else.  It is all written and

19  it's all very clear in my mind.

20  Q.  Do you have your diary with you?

21  A.  I do not have it with me, but if you need to see it or

22  anything, it is quite available.

23  Q.  Have you given it to the government?

24  A.  No, I have not, but it is there.

25  Q.  You did give the government --

1   A.  It's there, and it's not clouded by anything, no, it isn't,
2   sir.
3   Q.  You did give the government a page written by you dated
4   December 20, 2005, didn't you?
5   A.  Yes.
6   Q.  Is that from your diary?
7   A.  Is that from my --
8   Q.  Diary.
9   A.  Yes, those pages are.  That's something that was written by
10  him; is that right?  Yes.
11  Q.  He wrote in your diary?
12  A.  Those are pages that I kept in my diary.
13  Q.  Right.
14  A.  Yeah.
15  Q.  And did he write in your diary?
16  A.  He didn't write in my diary, but those are pages that I
17  kept that -- things that I kept in my diary, no.  Those are
18  pages that he wrote and I kept in my diary, as I do everything,
19  and he knows that.  Those are pages that I kept, yeah, in my
20  diary, written by him, as I do everything.  Yeah, handwritten.
21  He knows that because he used to always say "Write that down,
22  keep that."
23          MS. JOHNSTON:  Your Honor, if we may have a minute.
24          THE WITNESS:  Uh-huh, that's his handwriting.  Let him
25  look at it.

1          THE COURT:  All right.  Please now wait until you are

2     asked another question while counsel confer.

3          MR. WEIS:  May I approach, Your Honor?

4          THE COURT:  Go ahead.

5          MR. WEIS:  I'm going to see if I have an extra copy of

6     this in my file for the court while I present it to her.

7          THE COURT:  Okay.

8     Q.  My question is going to be whether or not you recognize this

9     handwriting.

10    A.  This is my handwriting, things that he said to me.

11         MR. WEIS:  I do have another copy for the court.  I

12    just need to take the package apart.

13    Q.  May I have the exhibit back, please.  Thank you.

14         In that document, you write down complaints that he has

15    about you, don't you?

16    A.  Yes.

17    Q.  And in that document, you write down complaints that you

18    have about him, such as he wasn't going to pay the January house

19    payment; isn't that correct?

20    A.  Yes.

21    Q.  There's no mention in that document about a gun, is there?

22    A.  There's none on this one.

23    Q.  And that's the one you chose to give to the government;

24    isn't that correct?

25    A.  That's the one I gave the government.

1   Q.  And who decided which page or pages to give the government?

2   A.  I did.

3   Q.  Now, you testified that his sister Grace took a gun from

4   him?

5   A.  Yes, she did.

6   Q.  Do you remember --

7   A.  Sitting outside at a picnic table in our backyard.

8   Q.  And did she keep the gun for a period of time?

9   A.  Yes, she did.

10  Q.  Did Mr. Chester eventually get the gun back?

11  A.  I don't know if he did or not.

12  Q.  Was the gun which was found in your house on the day he was

13  arrested the same gun that Grace took from him?

14  A.  I don't know if that was the gun or not.  They took a rifle

15  and I don't know what else from him.

16  Q.  So you don't know whether or not they took a handgun?

17  A.  Yes, they did.  They took a handgun and a rifle.

18  Q.  So you do know that they took a handgun.

19  A.  Yes.

20  Q.  Do you remember that you testified before the grand jury

21  concerning this case back on May 6th, 2008?

22  A.  Do I remember?

23  Q.  That you testified.  I don't expect that you or anyone else

24  would remember word-for-word what you testified to, but do you

25  remember that you did in fact testify?

1   A.   Yes.

2   Q.   Okay.  And when you testified before the grand jury, you

3   took an oath to tell the truth; isn't that right?

4   A.   Yes.

5   Q.   And you testified about Grace getting the gun, didn't you?

6   A.   Yes.

7   Q.   And didn't you testify as follows, and I'm going to -- on

8   page 13, I intend to start at line 11.

9        Do you recall being asked the question:  What are the

10  circumstances of the first time you saw the pistol?

11  A.   No.  What are they?

12  Q.   Okay.  You don't recall the question is what you are saying.

13  A.   No, I don't.

14  Q.   If I represented to you that the transcript of the

15  proceedings says that you were asked that question, would you

16  disagree?

17  A.   Would I disagree?

18  Q.   Would you disagree with me?

19  A.   If I can't remember the question, how can I disagree?

20  Q.   And do you recall that your answer to the question was:  The

21  first time I think probably was when I was threatened with it.

22       Do you recall that answer?

23  A.   I was threatened with the gun?

24  Q.   Do you recall the following sequence of question and answer?

25       Question:  What are the circumstances of the first time you

1    saw the pistol?

2        Answer:  The first time, I think, probably was when I was

3    threatened with it.

4        You are nodding your head.  Does that mean you do recall

5    that?

6    A.  That's when I saw the gun.

7    Q.  Yes.  Do you recall that question and answer?

8    A.  No.

9    Q.  Do you recall the following question and answer?

10       Question:  What do you mean by that?

11       Answer:  Well, he threatened me with it before when we had

12   gotten into an argument.

13   A.  That's what he does.  He threatens me with the gun every

14   time he has the gun.

15   Q.  Do you recall that question and answer?

16   A.  No.

17   Q.  Do you recall the following question and answer?

18       Question:  Okay.

19       Answer:  A fledged-fill fight.

20       Do you recall that?

21   A.  No.

22   Q.  And do you recall the following question and answer?

23       Question:  Does he --

24       And then you interrupt, Answer:  Physically?

25   A.  Yes.

Linda Guerrant – Cross by Mr. Weis                    47

1   Q.  Question:  On that occasion, did he show you the gun?

2       Answer:  Once, uh-huh, yes, I was shown the gun.  And then

3   when he went to sleep, I took the gun away, took it to his

4   sister's house and gave it to her to keep.

5       Do you recall that question and answer?

6   A.  No.

7   Q.  And then, question:  At some point later then does he get --

8   does that gun reappear?

9       Answer:  Yes, it does.  He goes to get it back.  He took

10  it -- he -- she gave it back to him.

11      Do you recall that question and answer?

12  A.  No, I don't.

13          MR. WEIS:  May I approach, Your Honor?

14          THE COURT:  Go ahead.

15  Q.  I show you what I represent to you to be the transcript of

16  your grand jury testimony, and I'll point you to page 13,

17  beginning on line 6.

18          MR. WEIS:  For the record, the witness turned over to

19  page 7.  Okay.

20  Q.  Did I accurately read what was in the transcript?

21  A.  You did.

22  Q.  Thank you.

23          MR. WEIS:  Your Honor, I would move that the transcript

24  of the grand jury testimony be marked as an exhibit as prior

25  recollection recorded, as she did not recall the testimony.

1            THE COURT:  How many pages of the transcript are

2    furnished?

3            MR. WEIS:  Sorry?

4            THE COURT:  How many pages of the transcript are

5    furnished?

6            MR. WEIS:  The transcript itself, the grand jury

7    transcript has four pages on one, and the total number of pages,

8    including the -- well, not including the index is eighteen, four

9    pages on one piece of paper.  It's not very long.

10           THE COURT:  All right.  Any objection?

11           MS. JOHNSTON:  Your Honor, may I look at it?  I was not

12   the --

13           THE COURT:  Yes, ma'am.

14           MS. JOHNSTON:  -- AUSA assigned to the case at the

15   time.

16           THE COURT:  Go ahead.

17      (Pause.)

18           MS. JOHNSTON:  Your Honor, thank you.  I've had a

19   chance -- may I just make clear.  You want the whole transcript

20   made a part of the record?

21           MR. WEIS:  The only relevant part is the part that I

22   read, but for context purposes, I was going to make the whole

23   transcript a part of the record.

24           MS. JOHNSTON:  No objection.

25           THE COURT:  All right.  Is it marked?

1          MR. WEIS:  Not yet, but it will be.

2      Your Honor, it's been marked and I move it be admitted as

3  defendant's exhibit 2.

4          THE COURT:  There's no objection to defendant's 2 and

5  it is admitted.

6          MS. JOHNSTON:  No, Your Honor.

7          THE COURT:  Thank you.

8      (Defendant's exhibit 2 was admitted.)

9  BY MR. WEIS:

10  Q.  Now, you've testified that since the two of you split up,

11  your life has gotten a lot better; is that correct?

12  A.  Yes.

13  Q.  It definitely has, hasn't it?  Now that the relationship is

14  over, your life is a lot better, isn't it?

15  A.  Yes.

16  Q.  Do you think maybe his life is a lot better, too?

17  A.  I doubt it.

18          MR. WEIS:  I have no further questions.

19          MS. JOHNSTON:  No further questions, Your Honor.

20                          **EXAMINATION**

21  **BY THE COURT:**

22  Q.  Ms. Guerrant, you stated at one time that the defendant had

23  threatened you with a gun twice --

24  A.  Yes.

25  Q.  -- or I think you said at least twice is the way you put it.

1    And then later in your testimony you said that he threatens me

2    with a gun every time he has a gun.

3    A.  He does.

4    Q.  And so, I'm trying to figure out which it is.  Were you

5    threatened on two occasions?

6    A.  Yes, I really was.  Bo, he does -- he is -- really is a

7    person that is just -- I can't describe it.  He's just, his

8    nature is one that's just like totally -- I can't say.  It's

9    like seemingly without moral values or anything like that.  It

10   is just like this kind of underlying personality where he gets

11   off with that and wants you to think that he is something that

12   he is not and he will try to play the game, when in reality he

13   is doing things that he is not supposed to, and he has a very

14   threatening nature and he has done all of the things that I said

15   that he does.

16   Q.  Yes.  Let me interrupt you, because I'm just focusing on one

17   thing right now and that's threatening you with a gun.

18   A.  And he has.

19   Q.  And you indicated he had done it at least twice one time.

20   A.  Yes.

21   Q.  And then later you said he threatened me every time he has a

22   gun.  And so, I'm trying to figure out with what frequency this

23   has occurred.  So I'm going to start with this.  Do you remember

24   a specific instance where he threatened you with a gun?

25   A.  Yes, I do.

1    Q.  Would you tell me about it?

2    A.  Once when we were in our living room, and he had bought a

3    gun, had a gun, and he said, "Here, here, take this gun, shoot

4    yourself, kill yourself," and he did that to me, he did, and had

5    me -- and had the gun, and said, "Here, take the gun, kill

6    yourself, shoot yourself."  He threatened me with a gun that

7    time.

8         And I do remember specifically, he had pulled that

9    information out with the thing -- incident with Grace, and that

10   actually happened.  And whether or not I testified with the

11   grand jury and he is trying to make me think that because I had

12   a stroke, that that part didn't happen, that actually happened.

13   Q.  And so, do you remember when this time occurred where he

14   handed you the gun --

15   A.  In the living room, he went in --

16   Q.  I understand, but do you remember about the year that it

17   happened?

18   A.  I would say that happened -- that was quite recent, just

19   before the breakup that we had in '07.

20   Q.  How long before 2007?

21   A.  About -- about -- I would say about five years before,

22   because he went and we have a pantry.

23   Q.  All right.

24   A.  And that happened with the rifle, that's what that happened

25   with the rifle.  He went in and got that.

Linda Guerrant – Examination by the Court                52

1    Q.  So the weapon that he handed to you was a rifle?

2    A.  Was a rifle.

3    Q.  All right.  On that occasion did he threaten to shoot you?

4    A.  Yes.

5    Q.  As well as hand you the rifle and tell you to shoot

6    yourself?

7    A.  To shoot yourself, "Go ahead, kill yourself," that's what he

8    said.

9    Q.  Now then, this occurred before the first domestic assault in

10   2004, did it?

11   A.  Yes.

12   Q.  And then when was another occasion where you were threatened

13   with a gun?

14   A.  The one with -- the last one that we went to trial for.

15   Q.  And would that be the battery that took place on -- in

16   2007 --

17   A.  '07.

18   Q.  -- that resulted in this charge here --

19   A.  This charge, yes.

20   Q.  -- of his possession of a weapon after having been convicted

21   of domestic assault.

22   A.  Right, yes.

23   Q.  And did that threat happen at the time of the 2007 assault?

24   A.  Uh-huh, yes, it did.

25   Q.  And what were the circumstances?  Can you describe it for

1  me?

2  A.  Well, it happened because I had a situation in the shed and

3  he was beating me up and he ran upstairs to get the gun, and,

4  you know, he had said some things and was calling me names and

5  everything, so he threatened to kill me then.

6  Q.  Well, did he have the gun in his hand when he said that?

7  A.  No, he was looking for the gun.

8  Q.  And so, did he find the gun?

9  A.  No, he didn't actually find the gun then.  They came in and

10  got the weapons, but he was -- yeah.

11  Q.  And is that because the police had already been called --

12  A.  Yes, my daughter.

13  Q.  -- while the argument was going on?

14  A.  I had called the police, yes.

15  Q.  And so, as I understand it, he didn't threaten you in 2007

16  at the time of the assault with a gun in hand.  Rather, he said

17  I'm going to do you harm and it was as though he was going to

18  get the gun at the time.

19  A.  Yes.

20  Q.  But is it the case that the officers intervened and were

21  present before he actually got the gun?

22  A.  Yes.

23  Q.  Now, were there any other occasions?

24  A.  Yes, there have been other occasions that he had threatened

25  me with a gun.

1    Q.  When he had a gun in hand?

2    A.  No, no.  He always threatened to kill me.

3    Q.  So the gun or guns were somewhere in the house at the time

4    he made those threats and did these threats take place in the

5    house?

6    A.  Yes, yes.

7    Q.  But the fact is he didn't actually go get a gun on those

8    occasions at all, did he?

9    A.  No, no.

10   Q.  Very good.  Now, any others?

11   A.  No.

12           THE COURT:  Thank you, ma'am.  I would ask if there are

13   any other questions.

14           MS. JOHNSTON:  Your Honor, I would like to ask a couple

15   of questions.

16           THE COURT:  Go ahead.

17                        **REDIRECT EXAMINATION**

18   **BY MS. JOHNSTON:**

19   Q.  Ms. Guerrant, with regard to the diary that Mr. Weis asked

20   you about, the pages that were there, those were provided to me

21   by you; is that correct?

22   A.  Yes.

23   Q.  And is it true that I didn't ask you for those, you just

24   brought those to me, right?

25   A.  That's right, yes.

1    Q.  And you didn't bring your complete diary.  You just said,

2    "Here's a couple of pages that I think you would be interested

3    in."

4    A.  Yes, that's right.  That's right.

5    Q.  Do you recall when you gave those to me?

6    A.  The day you asked -- I brought them when I did the -- I

7    guess it was called a deposition or I spoke with you the first

8    time.

9    Q.  Ms. Guerrant, and then there was also one other page that

10   was a handwritten page.  Do you recall giving that to me as

11   well?

12   A.  Yes, but that -- that wasn't written by me.

13   Q.  And who wrote -- who wrote that page?

14   A.  Bo.

15   Q.  And do you remember specifically what was said on that page?

16   A.  It was just asking for money to pay a bill.

17   Q.  Do you remember anything else about that?

18   A.  No, I don't recall the whole thing, just name calling --

19           MS. JOHNSTON:  Your Honor, may I approach?

20   A.  -- and stuff.

21   Q.  Ms. Guerrant, I'll show you what I'm referring to.  It has

22   not been marked as an exhibit.  Do you remember this?

23   A.  I always remember, yeah, the name calling.

24   Q.  What is that?

25   A.  (No response.)

1   Q.  Do you recognize it?

2   A.  (No response.)

3   Q.  I'm sorry, Ms. Guerrant, you have to speak for the court

4   reporter to be able to see you or hear you.

5   A.  It's disgusting.

6   Q.  Do you recognize that document I gave you?

7   A.  Yeah.

8   Q.  How is it that you recognize it?

9   A.  It's just something he always did.

10  Q.  When you say he, are you referring to Mr. Chester?

11  A.  Yeah.

12  Q.  And did he prepare that?

13  A.  Yeah.  It's names, you know, things he's called me.

14  Q.  Did he give you that piece of paper?

15  A.  It was just names he always called me.

16  Q.  And can you read that for the court?

17  A.  "I always remember you are a bitch.  You are -- you are

18  stupid.  You were used for 21 years."

19  Q.  And is there a date on that?

20  A.  December 2005.

21  Q.  Did Mr. Chester write that?

22  A.  It was something he always told me.

23  Q.  So who actually wrote that down?

24  A.  I wrote it down because it's what he always told me.

25  Q.  So that's what -- you're writing what he said to you.

1    A.   Yeah.

2    Q.   Why did you write it down?

3    A.   Because that's what he always told me.  That's why he kept

4    me around.

5    Q.   And how long have you kept that?

6    A.   (No response.)

7    Q.   Ms. Guerrant, how long have you kept that piece of paper?

8    A.   All this time.

9    Q.   So you wrote it down on the date that it is on the document;

10   is that correct?

11   A.   Yeah.

12   Q.   And you've kept it all that time?

13   A.   Yes.

14   Q.   And you just recently gave me that document when you met

15   with me earlier --

16   A.   Yeah.

17   Q.   -- this week?

18            MS. JOHNSTON:  Your Honor, I would move that that be

19   marked as a government's exhibit.  I believe it will be 1

20   because the other exhibits were court exhibits, so I would move

21   the admission of that document.

22            MR. WEIS:  No objection.

23            THE COURT:  May I see that document, please?

24            MS. JOHNSTON:  Yes, Your Honor.

25            THE COURT:  Thank you.  Is it marked as government 1?

1          MS. JOHNSTON:  I ask that it be marked as government's

2     number 1 and be moved into evidence, Your Honor.

3          THE COURT:  Any objection?

4          MR. WEIS:  No, Your Honor.

5          THE COURT:  It is admitted.

6       (Government's exhibit 1 was admitted.)

7          MS. JOHNSTON:  I have no further questions, Your Honor.

8                    **RECROSS–EXAMINATION**

9     **BY MR. WEIS:**

10    Q.  Ms. Guerrant --

11         THE COURT:  Let me ask before you proceed.

12         MR. WEIS:  I'm sorry.

13         THE COURT:  Is this December 20, 2005, item part of the

14    record?

15         MS. JOHNSTON:  It was not prior to today, Your Honor.

16         THE COURT:  But has it been marked and introduced

17    today?

18         MS. JOHNSTON:  Yes.

19         THE COURT:  Thank you.

20       Please go ahead.

21    BY MR. WEIS:

22    Q.  Is there any other written document or piece of paper that

23    you supplied to Ms. Johnston in preparation for this hearing,

24    other than the two which have now been admitted?

25    A.  Excuse me?  What?

1    Q.  Did you supply Ms. Johnston with any other written

2    documents, that is, documents written by you prior to this --

3    beginning of this proceeding, other than the two which have been

4    admitted?

5    A.  The other one.  There's another one.

6              MR. WEIS:  May I approach, Your Honor?

7              THE COURT:  Go ahead.

8    Q.  I have -- I'm putting before you what has been admitted as

9    government's exhibit 1 and defendant's exhibit 1.  These are two

10   handwritten documents that you have testified you wrote.  Did

11   you give Ms. Johnston any other documents which you wrote in

12   preparation for this hearing?

13   A.  There's another one.  I gave another piece of paper.  That I

14   wrote?

15   Q.  Yes, that you wrote.

16   A.  Oh, no.

17   Q.  No, okay.  Did you give to Ms. Johnston any paper or

18   document which was written by Bo Chester?

19   A.  Yeah.

20   Q.  Describe it.

21   A.  It was something about a bill or something that he --

22             MR. WEIS:  Your Honor, I would represent that I

23   received discovery from the government, and I assume it was all

24   the material that Ms. Guerrant supplied and that's all I got.

25   Ms. Johnston, of course, is looking through the file to see if

1    there's something else.

2              MS. JOHNSTON:  Your Honor, may I talk with Mr. Weis

3    just for a second?

4              MR. WEIS:  Sure.

5              MS. JOHNSTON:  Save the court some time.

6         (Pause.)

7    BY MR. WEIS:

8    Q.   The document, the additional document you supplied to

9    Ms. Johnston, was that something which Mr. Chester wrote or was

10   it something else?

11   A.   Maybe that was it.  I thought it was -- I was maybe counting

12   two sheets, these two sheets.  I think it was -- because I said

13   it was three sheets.  This is it.

14   Q.   Okay.  And that sheet --

15   A.   Was it three just --

16   Q.   All right.  And that sheet which you are picking up with

17   your right hand was defendant's exhibit 1.  Am I correct?

18   A.   I thought it was three sheets, so maybe this is the three

19   sheets.

20   Q.   Yes, okay.  Now, in that document that you wrote that is

21   defendant's exhibit 1, in that document, you report Mr. Chester

22   saying that you should leave him; isn't that right?

23   A.   (No response.)

24   Q.   Isn't that one of the things you report Mr. Chester telling

25   you according to that document?

1   A.  Yes.

2   Q.  Thinking back to the incident where he gave you the gun,

3   that happened in the course of an argument between the two of

4   you.  That's correct, isn't it?

5   A.  Yes.

6   Q.  And isn't it a fact that you threatened to kill him?

7   A.  I don't recall that.

8   Q.  And isn't it a fact that he gave you the gun and said,

9   "Here, you know, do it or kill me" or something of that nature?

10  A.  Do I recall him saying "Kill me"?

11  Q.  Yes, when he gave you the gun.

12  A.  I don't recall that.

13  Q.  Is it possible that both of you were drinking at the time?

14  A.  That's possible.

15          MR. WEIS:  I have no further questions.

16          MS. JOHNSTON:  No further questions, Your Honor.

17          THE COURT:  Thank you, ma'am.

18      And I take it that Ms. Guerrant may be excused from this

19  hearing?

20          MS. JOHNSTON:  Yes, Your Honor.

21          MR. WEIS:  Yes, Your Honor.

22          THE COURT:  Ms. Guerrant --

23          THE WITNESS:  Yes.

24          THE COURT:  -- you are excused from the hearing.  Let

25  me caution you that you are not to discuss your testimony with

1    any other witness in this hearing until the hearing is over.  We

2    expect it to be completed today.  I hope it's going to be

3    completed today.

4              THE WITNESS:  Yes, sir.

5              THE COURT:  Until that time, as I say, you are not to

6    discuss your testimony with any other witness or potential

7    witness in the case.

8              THE WITNESS:  Yes, sir.

9              THE COURT:  Thank you, ma'am.

10             THE WITNESS:  Thank you.

11        Do I leave those here?

12             MR. WEIS:  Your Honor, my client is a diabetic and

13   feeling faint now from lack of sugar.  Could we have a brief

14   recess to get something to eat?

15             THE COURT:  All right.  How much time do you need?

16             MR. WEIS:  Can't be more than five minutes.  I'm sure

17   we can find something in the vending machine.

18             THE COURT:  We'll be in recess for five minutes.  If

19   you need more time than that, just let us know.

20             MR. WEIS:  I will.

21        (At 4:34 p.m. there was a recess until 4:54 p.m.)

22             THE COURT:  Please be seated.

23        Mr. Weis, are we ready to proceed?

24             MR. WEIS:  Yes, Your Honor.

25             THE COURT:  Does the government have further witnesses?

Meghan Chester – Direct by Ms. Johnston                63

1          MS. JOHNSTON:  Yes, Your Honor.  The United States has

2    one more witness.  The United States calls Meghan Chester.

3          THE CLERK:  Ms. Chester, would you please come forward

4    and be sworn.

5          **MEGHAN CHESTER, UNITED STATES WITNESS, SWORN**

6                    **DIRECT EXAMINATION**

7    **BY MS. JOHNSTON:**

8    Q.  Ms. Chester, can you make sure that the microphone is close

9    to you.  Please state your name for the record.

10   A.  Meghan Leigh Chester.

11   Q.  How old are you?

12   A.  Twenty-nine.

13   Q.  What is your educational background?

14   A.  I have a Bachelor of Science in communications from West

15   Virginia State University, with a minor in broadcast journalism.

16   Q.  Are you presently employed?

17   A.  Yes.

18   Q.  How are you employed?

19   A.  I work as a service coordinator for Community Services,

20   Incorporated.  It's a Title XIX waiver program, working with

21   mentally retarded and mentally disabled individuals.

22   Q.  Where do you work?

23   A.  It's in St. Albans, West Virginia.

24   Q.  How long have you worked there?

25   A.  Since March of this year.

Meghan Chester – Direct by Ms. Johnston                64

1    Q.  Do you have any children?

2    A.  Yes.

3    Q.  How many children?

4    A.  I have a daughter.

5    Q.  How old is she?

6    A.  She is two.

7    Q.  What does she do while you work?

8    A.  She goes to daycare.

9    Q.  Do you know the defendant in this case, William Samuel

10   Chester, Jr.?

11   A.  Yes.

12   Q.  How is it that you know him?

13   A.  He's my father.

14   Q.  Do you see him in the courtroom?

15   A.  Yes.

16   Q.  Can you tell the court where he is seated and what he is

17   wearing?

18   A.  To my left wearing a black sport coat.

19        MS. JOHNSTON:  Your Honor, may the record reflect that

20   she has identified the defendant?

21        MR. WEIS:  No objection.

22        THE COURT:  The record may so indicate.

23   Q.  Ms. Chester, when you were growing up, did you reside in the

24   same residence as the defendant?

25   A.  Yes.

Meghan Chester – Direct by Ms. Johnston                65

1   Q.  And who else resided in that residence when you were growing

2   up?

3   A.  My mom and my two sisters.

4   Q.  What are your two sisters' names?

5   A.  My older sister is Anitra and my younger sister is Samantha.

6   Q.  Ms. Chester, are you the victim in the April 26, 2004,

7   domestic violence incident involving your father?

8   A.  Yes.

9   Q.  And what injuries did you suffer?

10  A.  A broken nose and a concussion.

11          MR. WEIS:  Your Honor, I believe we stipulated the

12  facts of this.

13          MS. JOHNSTON:  That's fine, Your Honor.  Mr. Weis is

14  correct.  We did stipulate.

15  Q.  As a result of --

16          THE COURT:  Excuse me.  Is the stipulation that which

17  is contained in the statement that was filed?

18          MR. WEIS:  Both the statement and the police report,

19  Your Honor.

20          THE COURT:  Thank you.  That is, they cover the matter

21  just referred to in the testimony?

22          MR. WEIS:  Yes, Your Honor.

23          THE COURT:  Thank you.

24      Please go ahead.

25          MS. JOHNSTON:  Thank you, Your Honor.

Meghan Chester – Direct by Ms. Johnston                66

1    BY MS. JOHNSTON:

2    Q.  Ms. Chester, when you were growing up, was your father

3    mentally abusive toward you?

4    A.  Yeah, at times could be.  I mean, it wasn't any -- yeah,

5    there were -- he would be a little meaner than normal I guess

6    you could say, yeah.

7    Q.  Was he mentally abusive toward your sisters?

8    A.  I mean, yeah, a little meaner than normal.  I can remember

9    incidences that they would tell me, a little meaner than normal.

10   Q.  Did he cuss or yell at you continuously?

11   A.  Yes, when he was angry.

12   Q.  Did he have a drinking problem, if you know?

13   A.  Yes.

14   Q.  How is it that you know that?

15   A.  It was pretty obvious.  It was pretty obvious.  He usually

16   had a beer or some sort of drink very often.  It was pretty

17   obvious.

18   Q.  Did you personally observe him drink?

19   A.  Yeah, yes.

20   Q.  How often would he drink?

21   A.  It was pretty regular.  I mean, it wasn't abnormal to see

22   him drinking if that makes sense.  It was -- it wasn't something

23   that it was a surprise to see.

24   Q.  Well, would you -- would it be fair to say that you saw him

25   drink every day?

1    A.  At least every other, at least every other.

2    Q.  Did your mom also drink at the time?

3    A.  Yes.

4    Q.  Has she gotten some help for her drinking problem, if you

5    know?

6    A.  I know that she has been to rehab before, yes.

7    Q.  When you were growing up, was your father physically abusive

8    towards your mother?

9    A.  There, I can remember one -- once seeing him hold her down

10   and by her throat on the couch.  I can remember, I was maybe

11   seven maybe when that happened.  That's the only thing that

12   really sticks out in my mind is seeing that, so yes.

13   Q.  And that -- you are saying that's when you were seven?

14   A.  Yeah, about seven.  Yeah, I was about seven.

15   Q.  Did your father have firearms in your home when you were

16   growing up?

17   A.  I knew he had a gun.  I didn't necessarily know where he

18   kept it, but I knew he had a gun.

19   Q.  Do you know whether or not your father ever threatened to

20   use a firearm against your mother?

21   A.  I heard stories.

22          MR. WEIS:  Your Honor, I object to heard stories.

23   That's obviously hearsay.

24          MS. JOHNSTON:  I'm not going to ask her, Your Honor,

25   what she heard.  I just asked her --

Meghan Chester – Cross by Mr. Weis                68

```
1    Q.  Do you know whether or not your father ever threatened your
2    mother with a firearm?
3            MR. WEIS:  Then my objection is failure to lay a
4    nonhearsay foundation for the question.
5            THE COURT:  The objection is sustained.  Lay a
6    foundation.
7    Q.  Ms. Chester, did you ever see your father threaten your
8    mother with a firearm?
9    A.  No.
10   Q.  Did you ever hear from anyone else that that happened?
11   A.  Yes.
12           MR. WEIS:  Objection.
13           THE COURT:  The objection is sustained.
14           MS. JOHNSTON:  I think that's all the questions I have
15   of Ms. Chester.
16       I'm sorry, I do have a few.
17   BY MS. JOHNSTON:
18   Q.  Ms. Chester, are you still scared of your father?
19   A.  Yes.
20   Q.  Do you have contact with him?
21   A.  Sporadic, at best.  I mean, holidays, occasional how are you
22   doing text; not really anything meaningful, I don't think.
23           MS. JOHNSTON:  I have nothing further, Your Honor.
24                       CROSS-EXAMINATION
25   BY MR. WEIS:
```

1    Q.  Ms. Chester, you have seen your father at various holiday

2    gatherings with the Chester family, haven't you?

3    A.  Yes.

4    Q.  And everything at least stayed civil?

5    A.  Yes.

6    Q.  And this is, of course, since your mother and father

7    separated.

8    A.  Yes.

9    Q.  And you have taken your daughter to visit with your father

10   on at least one, if not more, occasions in Huntington?

11   A.  Yes.

12   Q.  And everything stayed civil then, too, didn't they?

13   A.  Yes.

14   Q.  Is it fair to say that all the basis for any fear you may

15   have is what you saw when you were growing up and nothing that

16   has happened since your mom and dad separated?

17   A.  Yes.

18          MR. WEIS:  I have no further questions.

19          MS. JOHNSTON:  No further questions, Your Honor.  She

20   may be excused as far as the government is concerned.

21          MR. WEIS:  And so far as we are concerned.

22          THE COURT:  Thank you.

23      Ms. Chester -- and I may be mistaken.  Chester is your last

24   name still?

25          THE WITNESS:  Yes, sir.

1              THE COURT:  Let me note to you that you are excused

2       from the hearing, but you are not to discuss your testimony with

3       any other witness in this hearing until the hearing is over.

4       It's my hope it's going to be over today.  I'm not sure.  It's

5       getting so late.  But at any rate, that limitation.  Thank you.

6              THE WITNESS:  Thank you.

7              THE COURT:  And Ms. Chester, I may not have made it

8       clear in my direction, but it is that you are not to discuss

9       your testimony with any other individual who may be a witness in

10      the hearing.

11             THE WITNESS:  Yes, sir.

12             THE COURT:  Thank you.

13             MS. JOHNSTON:  Your Honor, the United States does not

14      have any other witnesses to present today.

15             MR. WEIS:  Your Honor, I have two witnesses.  I think

16      we can have them both today as I don't think either of them will

17      be extensive.  The first witness is U.S. Probation Officer

18      Mildred DeVore.

19             THE COURT:  How long will those witnesses likely take?

20             MR. WEIS:  I think we can complete the hearing in half

21      an hour or at most forty-five minutes if it's just taking

22      evidence.

23             THE COURT:  All right.  Anything further?  Will you

24      have, do you think, further evidence?

25             MR. WEIS:  The only thing we need to discuss are the

```
 1    articles that the government has proffered as evidence.  That's
 2    another issue, but that's separate and apart from having
 3    witnesses.
 4            THE COURT:  Yes, it's not dealing with the witnesses at
 5    all.
 6            MR. WEIS:  Correct.
 7            THE COURT:  And will the government likely have
 8    anything after that?
 9            MS. JOHNSTON:  Your Honor, I don't believe so, but I
10    would like an opportunity, if the court would so permit, for me
11    just to address or ask defense counsel's reason for calling the
12    two witnesses.  I thought at the last hearing, the court had
13    ruled that you were not going to allow in the record the fact
14    that Mr. Chester was doing well after his conviction.  I thought
15    we had already ruled that that was not a part of the record, it
16    was not important.  So I don't know what Ms. DeVore could add
17    and Mr. Chester's new girlfriend could add that is really
18    relevant to the issue before the court today.
19            MR. WEIS:  Your Honor, my recollection, similar to
20    Ms. Johnston, is I made the argument that my client should be
21    able to raise overbreadth as the Supreme Court indicated the
22    students in the *Fox* case could, and to help show his standing
23    for that, I wanted to show that his changes in behavior since
24    the split-up and while he has been on supervised release, while
25    he was on bond, I think that is definitely relevant to the issue
```

1    of whether or not he does have standing, as that term was

2    applied at least to the First Amendment area in the *Fox* case.

3           THE COURT:  Just one moment.

4      Ms. Steinke has been taking daily transcript in a trial this

5    week that she continues into next week and maybe the week after.

6    And so, I want to try to get some idea how long this hearing is

7    going to go because she can just take so much, and she is here

8    every night until after 10:00 o'clock and then ready to go the

9    next morning.  And so, if this is going to take much time, we'll

10   have to do this at another time.

11          MR. WEIS:  I don't think it's going to take much time.

12   I know my direct is going to be quite short with both of them.

13          MS. JOHNSTON:  Your Honor, may I comment on that?

14   First of all, it may be that we may be able to work out a

15   stipulation and these witnesses wouldn't need to testify.  But I

16   think really the court -- the court, you know, may not allow

17   this, unless the court is ruling today that the overbreadth

18   doctrine does apply in this case.  I mean, in the *Skoien* case,

19   it was pretty clear that the court wouldn't allow that to

20   happen.  I cited a case, the *Masciandaro* case in the Fourth

21   Circuit that didn't allow it.  So I think perhaps before we

22   waste the court's time on this issue, we could --

23          THE COURT:  Ms. Johnston, I understand that, and I

24   might take that view.  This case has been to the Fourth Circuit

25   once, and when it goes back the next time, assuming it does, I

1   want the material to be available even if I decide it's not

2   relevant.  And so, I don't see any way to avoid taking the

3   evidence.  I appreciate your point, but I think this is a

4   peculiar circumstance, and as a consequence, we need to hear

5   what is offered.  And so, we'll see whether or not we can move

6   this with dispatch.

7          MR. WEIS:  I'll try to be as brief as I feel I

8   ethically can be.

9          THE COURT:  Thank you.

10         MR. WEIS:  My first witness will be Ms. DeVore.

11         THE CLERK:  Would you please come forward here to be

12  sworn, Ms. DeVore.

13         **MILDRED DEVORE, DEFENDANT'S WITNESS, SWORN**

14                    **DIRECT EXAMINATION**

15  BY MR. WEIS:

16  Q.  Ms. DeVore, you are a United States Probation Officer, are

17  you not?

18  A.  Yes.

19  Q.  And you are assigned currently to supervise William Chester?

20  A.  Yes.

21  Q.  And William Chester is seated at defense table here, is he

22  not?

23  A.  Yes.

24  Q.  When did you begin supervision of Mr. Chester?

25  A.  March 2010.

1  Q.  Since you began supervision of Mr. Chester, has he obeyed

2  the conditions of supervised release to the best of your

3  knowledge?

4  A.  Yes.

5  Q.  Can you tell us what those conditions are?

6  A.  He was to complete five months of home confinement, which he

7  did; submit monthly reports.  He was subject to testing.  No

8  firearms; your standard conditions for this district.

9  Q.  And testing for drug abuse.

10 A.  Yes.

11 Q.  Including marijuana.

12 A.  Yes.

13 Q.  And all the tests have been negative?

14 A.  He has had a total of thirty-six tests, and all tests have

15 been negative.

16 Q.  He is also not allowed to drink excessively, is he?

17 A.  Correct.

18 Q.  And he has obeyed that condition as far as you know.

19 A.  As far as I know, yes.

20 Q.  Do you think he is a good candidate for early termination

21 perhaps?

22 A.  I do.

23       MR. WEIS:  I have no further questions.

24                    **CROSS-EXAMINATION**

25 **BY MS. JOHNSTON:**

Fran Jackson – Direct by Mr. Weis                    75

1    Q.  Ms. DeVore, who supervised Mr. Chester prior to March of

2    2010?

3    A.  For approximately a three- or four-month period, Douglas

4    Smith, and prior to that, Lola Toney.

5            MS. JOHNSTON:  I have nothing further, Your Honor.

6            MR. WEIS:  I have no redirect, Your Honor.  May this

7    witness be excused?

8            THE COURT:  Yes.  Ms. DeVore, thank you.

9       I must tell you that you are not to discuss your testimony

10   with any other potential witness in the case until the hearing

11   is over which I hope is going to be by 6:00 o'clock.

12           THE WITNESS:  Okay.

13           THE COURT:  So if you will continue to observe that

14   direction until that, of course.

15           THE WITNESS:  Okay.

16           THE COURT:  Thank you.

17           THE WITNESS:  Okay.

18           THE CLERK:  Would you please come here to be sworn,

19   ma'am.  Thank you.

20           **FRAN JACKSON, DEFENDANT'S WITNESS, SWORN**

21                      **DIRECT EXAMINATION**

22   **BY MR. WEIS:**

23   Q.  Could you state your name, please.

24   A.  Fran Jackson.

25   Q.  Do you live in Huntington, West Virginia?

Fran Jackson – Direct by Mr. Weis                    76

1   A.  Yes.

2   Q.  How long have you lived in Huntington?

3   A.  Since I graduated from Marshall.

4   Q.  A long time.

5   A.  Yes.

6   Q.  Okay.  Are you employed?

7   A.  Yes.

8   Q.  You have to speak up a little bit, all right?

9   A.  Okay.

10  Q.  What do you do for a living?

11  A.  I'm an administrator at Marshall University.

12  Q.  Administrator over what in particular?

13  A.  I'm in the Department of Multicultural Affairs, and we

14  coordinate programs and activities for our African American

15  students to kind of get them involved individually as well as

16  collectively at the university to help our students to graduate.

17  Q.  How long have you been doing that?

18  A.  Twenty-four years, be twenty-five in January.

19  Q.  Do you know William Samuel Chester?

20  A.  Yes.

21  Q.  And is he seated at defense counsel table?

22  A.  Yes.

23       MR. WEIS:  May the record reflect she has identified

24  the defendant?

25       MS. JOHNSTON:  No objection, Your Honor.

Fran Jackson – Direct by Mr. Weis                    77

1          THE COURT:  The record may so reflect.

2     Q.  When did you first meet Mr. Chester?

3     A.  I guess about five or six years ago.

4     Q.  When you met him, was he still living with his wife Linda?

5     A.  Yes.

6     Q.  At some point did he and Linda separate?

7     A.  Yes.

8     Q.  What happened with your relationship with Mr. Chester at

9     that point?

10    A.  We grew closer.

11    Q.  Did he start to live with you?

12    A.  Yes.

13    Q.  Did he go there immediately after he left Linda?

14    A.  Yes.

15    Q.  And is he living there now?

16    A.  Yes.

17    Q.  All the time that you've known him, has he ever been violent

18    toward you?

19    A.  No.

20    Q.  Has he ever been violent towards any other person in your

21    presence?

22    A.  No.

23    Q.  Has he ever threatened you with bodily harm?

24    A.  No.

25    Q.  Describe what he is like.

Fran Jackson – Direct by Mr. Weis                    78

1    A.  He is cool.  We do a lot of gardening.  He is retired, so he

2    is -- I mean, he is relaxed.  We have fun.

3    Q.  Uh-huh.  Have you ever seen him threaten violence toward any

4    other person?

5    A.  No.

6    Q.  Do you have any reason to fear him?

7    A.  No.

8    Q.  During the time that you've been living with him, that is,

9    since he left Linda, have you ever seen any signs that he has

10   been smoking marijuana?

11   A.  No.

12   Q.  Any signs that he has been drunk or drinking excessively or

13   anything like that?

14   A.  No.

15   Q.  Any signs that he is drunk?

16   A.  No.

17   Q.  By that, I don't mean he's drunk like too drunk to drive.  I

18   mean, he's been drinking alcoholic beverages.

19   A.  No.  No, he hasn't.

20   Q.  He hasn't, okay.  During the course of your relationship

21   with him, have you met any of his daughters?

22   A.  I've interacted in the same circles they have been in there,

23   like a family gathering, that Meghan has been down to my house

24   with her daughter, but we haven't sat and had conversations, but

25   I've just been in the same venues.

1    Q.  Was Mr. Chester present during those times that you saw

2    Meghan and Meghan's daughter?

3    A.  Yes.

4    Q.  Was there any cross words or anger or anything like that

5    between the two of them?

6    A.  No.

7           MR. WEIS:  I have no further questions.

8                    **CROSS-EXAMINATION**

9    **BY MS. JOHNSTON:**

10   Q.  Ms. Jackson, are you married?

11   A.  No.

12   Q.  Have you ever been married?

13   A.  No.

14   Q.  Do you have any children?

15   A.  No.  Nieces and nephews.

16   Q.  How was it that you met Mr. Chester?

17   A.  I met him through a mutual friend.  It was at an outing

18   somewhere.  It's been years ago, met him through a friend,

19   another friend of mine.

20   Q.  And you said you and him began dating five or six years ago?

21   A.  Probably a couple -- the past three, four years maybe.

22   Q.  So tell us, how long have you been dating Mr. Chester?

23   A.  Probably since '07.

24   Q.  Was it prior to his conviction for -- his federal conviction

25   here?

1   A.  Yes.

2   Q.  Do you know he is still married?

3   A.  Yes.

4   Q.  That doesn't bother you?

5   A.  No.

6   Q.  Did he tell you about his prior convictions?

7   A.  Yes.

8   Q.  So you know everything about him?

9   A.  Uh-huh.

10  Q.  Do you know about his domestic battery and domestic assault

11  conviction?

12  A.  Uh-huh.

13  Q.  And that doesn't bother you?

14  A.  No.

15  Q.  Do you have any firearms in your house?

16  A.  No.

17  Q.  Have you ever seen Mr. Chester drink?

18  A.  A long time ago, back in the day.

19  Q.  What's back in the day?

20  A.  Probably prior to this -- whatever happened in '07, I guess.

21  Q.  Where was it that you saw him drink then?

22  A.  Oh, probably when we've been together and gone somewhere or

23  whatever and had a drink or whatever.

24  Q.  Were you in a bar?

25  A.  We've been to a bar.

1   Q.  Do you think you are the cause of the breakup between him
2   and his wife?
3   A.  No.
4   Q.  Were there any other girlfriends that he had while he was
5   married?
6   A.  I haven't the slightest idea.
7   Q.  He never talked to you about that?
8   A.  I don't know.
9   Q.  I mean, he has never talked to you about that?
10  A.  No.
11  Q.  Have you ever asked him that?
12  A.  No.
13  Q.  Does Mr. Chester work?
14  A.  No, he is retired.
15  Q.  Where do you live in Huntington?
16  A.  McVeigh Avenue in Huntington.  It's behind Cabell Huntington
17  Hospital.
18  Q.  Is that -- do you live in a house there?
19  A.  Uh-huh.
20  Q.  Is that your house?
21  A.  Uh-huh.
22  Q.  Does Mr. Chester help you with any of the bills?
23  A.  Yes.
24          MS. JOHNSTON:  I have nothing further, Your Honor.
25          MR. WEIS:  One question on redirect.

1          THE COURT:  Go ahead.

2                    **REDIRECT EXAMINATION**

3  **BY MR. WEIS:**

4  Q.  The time or times that you saw Mr. Chester taking a drink,

5  was he still with his wife, Linda?

6  A.  Yes.

7          MR. WEIS:  I have no further questions.

8          MS. JOHNSTON:  Nothing further, Your Honor.

9          THE COURT:  And may Ms. Jackson be excused from the

10  hearing?

11          MR. WEIS:  Yes, Your Honor.

12          MS. JOHNSTON:  Yes, Your Honor.

13          THE COURT:  Ms. Jackson, you are excused from the

14  hearing.  Let me caution you not to discuss your testimony with

15  any other witness or potential witness in this hearing until

16  it's over which I hope will be pretty soon today.

17          THE WITNESS:  Okay.

18          THE COURT:  Thank you.

19          MR. WEIS:  Your Honor, I have no further witnesses.

20          THE COURT:  Thank you.

21          MR. WEIS:  I believe at the last hearing, that was a

22  part of the record in this case included the presentence report.

23  The relevance I believe it has is from the beginning of the time

24  when he was on federal pretrial supervision, he had not had any

25  positive urines for marijuana and also it describes his

1  treatment, I believe, at Alcoholics Anonymous.

2          THE COURT:  There's so many reports, I'm not sure that

3  I will remember this correctly, but it seems to me as though

4  there were indeed no reports but negative ones, but I can't

5  remember whether or not he tested positive at the moment of

6  arrest.  Do you recall?

7          MR. WEIS:  He did.

8          THE COURT:  But after that negative.

9          MR. WEIS:  Correct.

10          THE COURT:  Very good.  And is that the sum total of

11  what you need out of the presentence report?

12          MR. WEIS:  Other parts of it have been referred to

13  concerning the record of the offense, but I think that is the

14  part that's relevant to that which I have just --

15          THE COURT:  All right.

16          MR. WEIS:  -- for which I have been presenting

17  evidence.

18          THE COURT:  Or which?

19          MR. WEIS:  That is relevant to that for which I called

20  my two witnesses.

21          THE COURT:  All right.  Well, is there any other

22  relevant part of the presentence report that needs to be taken

23  into account?  I don't recall that there is anything else.

24          MR. WEIS:  Not -- not that I recall, Your Honor.

25          THE COURT:  All right.

1      Does the government have further testimony?

2            MS. JOHNSTON:  No, Your Honor.

3            THE COURT:  Does that conclude the record on everything

4      except publications?

5            MR. WEIS:  As far as I'm concerned it does, Your Honor.

6            MS. JOHNSTON:  Your Honor, I just have one question.

7      I'm confused and I apologize, but I thought at the last hearing,

8      that the court ruled that paragraph 8 and paragraph 41 are not

9      relevant and would not be made a part of the record.  I just

10     want to make sure.

11           THE COURT:  Paragraph 8 and 41 of the presentence

12     report?

13           MS. JOHNSTON:  I thought that was it, Your Honor.

14     Those were the two paragraphs that the court ruled were not

15     relevant.

16        I think I'm mistaken, Your Honor, but I guess there is --

17     there is still a question out there as to what Mr. Weis wanted

18     to be made a part of the record, and the court at the last

19     hearing said that it was not relevant.  So I'm just trying to

20     get clear --

21           THE COURT:  Well, let's take these one at a time.  The

22     offense conduct set forth on page 4 consisting of paragraph 7,

23     8, 9, 10, and 11 are part of the record in the case?

24           MR. WEIS:  Yes, Your Honor, it is.

25           THE COURT:  The portion of the report relating to

United States v. William Chester                          85

1   defendant's positive at the time of his arrest and negatives

2   thereafter has been stipulated to and doesn't need further

3   elaboration from the report.  You mentioned one other portion of

4   the report.  Did I hear you say it was paragraph 41?

5           MR. WEIS:  Yes, that's the part I was referring to.  I

6   did not have the number of the paragraph in my mind, but that's

7   what I was referring to.

8           THE COURT:  And the court will include that as a part

9   of the record of this hearing.

10      Secondly, what the court referred to at the prior hearing

11  was that the court would take the matters into account that

12  Mr. Weis was referring to for sentencing purposes, and,

13  nevertheless, the court has admitted them in this hearing so

14  that the full record is before the court, and whether the court

15  will give weight to those matters having to do with

16  rehabilitation and the like remains to be determined by the

17  court.

18          MS. JOHNSTON:  Thank you, Your Honor, for clarifying

19  that.

20          THE COURT:  Anything further on that by the defendant?

21          MR. WEIS:  No, Your Honor.

22          THE COURT:  Now, if that covers everything down to

23  publications.  Let me ask what publications is it or are there

24  that the parties are suggesting?

25          MR. WEIS:  Your Honor, the government has proffered and

1    asked that we have taken into account for the record three

2    publications.  The first in time is an article by Scott Feld and

3    Murray Straus called *Escalation and Desistance of Wife Assault*

4    *in Marriage*.  I have no objection to that being made part of the

5    record.

6              THE COURT:  All right.  That's 27 Criminology 141,

7    1989?

8              MR. WEIS:  Correct.

9              THE COURT:  Go ahead.

10             MR. WEIS:  The second and third ones are *Firearm Use in*

11   *Intimate Partner Violence, A Brief Overview*, by Susan B.

12   Sorenson, and it says at the bottom, Evaluation Review, Volume

13   30, Number 3, June 2006, I guess pages 229 to 236.  With regard

14   to that document, that is only a brief overview giving the

15   author's overview of many studies, at least some, if not most,

16   of which already are a part of the record in this case.  Given

17   that it has that status, I would object to it as it not being

18   anything of independent relevance.  It's an author's summary of

19   the raw research instead of independent research by the author

20   herself.

21        The third article is from the National NIJ Journal, I'm not

22   sure what NIJ stands for, Issue 250, November 2003, *Assessing*

23   *Risk Factors For Intimate Partner Violence*.  That, too,

24   doesn't -- it reports some independent research, but in a very

25   sketchy way without any way to judge it.  In light of that, I

1    would object to it, or, in the alternative, would request leave

2    to submit articles in rebuttal.

3        The articles that I would submit in rebuttal, at least I

4    believe I would, are articles dealing with the difficulty of

5    predicting future violence.  The APA in amicus briefs in

6    *Barefoot versus Estelle* and the Fifth Circuit case of *United*

7    *States versus Field* took the position that one really cannot

8    accurately predict future violence.

9        Now, I just got these recently.  I have not had the time to

10   fully read the articles which I believe I would submit, and I

11   don't want to submit something I haven't read.  So I would --

12           THE COURT:  When you say these, to what are you

13   referring?

14           MR. WEIS:  The --

15           THE COURT:  Are you referring to the government's three

16   articles or something else?

17           MR. WEIS:  Well, I'm referring to two of the

18   government's three articles.

19           THE COURT:  So I'll understand.  Are you saying that

20   you just got these recently, is that what --

21           MR. WEIS:  I just got the government's three articles

22   recently.

23           THE COURT:  All right.

24           MR. WEIS:  Okay.  And so, I have not had time to do --

25   actually I have someone else in my office do some research to

```
1    see about articles which might rebut some of their assertions,
2    and I believe they exist in view of the APA's amicus positions
3    in two cases.  Therefore, I would, if the court does admit them,
4    I would like leave to submit the articles in rebuttal.
5             THE COURT:  Well, the articles in rebuttal being what?
6             MR. WEIS:  Well, the articles which I believe support
7    the position of the APA in its amicus briefs that you cannot
8    scientifically or accurately predict future dangerousness.  And
9    I know I'm being vague and not specific, but I just am not in a
10   position to be specific at this time, given that I haven't had
11   time to complete the research or read -- I have two potential
12   articles here in my file I haven't had a chance to read, and I
13   don't like to cite things I haven't read.
14            THE COURT:  Anything else?
15            MR. WEIS:  No, Your Honor.
16            THE COURT:  What does the government wish to present?
17   Anything further beyond those three articles?
18            MS. JOHNSTON:  No, Your Honor, not at this time, but I
19   would note -- I mean, one of the reasons that I submitted these
20   three articles was based on a suggestion by the Department of
21   Justice that these should be included in the record in this
22   case.  They may or may not have been included in the record, I
23   apologize, I don't know specifically, but in the *Tooley* case
24   that I handled as far as empirical evidence and the *Staten* case
25   as well.
```

1    But I note that during our last hearing, this court said and

2 we agreed at that time, that there appeared to be other

3 empirical studies that the court may take into consideration,

4 and we both agreed that that would be okay.  So, in other words,

5 the court obviously was going to rely on what we had submitted

6 as empirical evidence, but the court on its own got us to agree

7 that you could consider other articles as well.

8    So it was in that vein, Your Honor, that I submitted these

9 other three articles to save the court some time.  It may be

10 helpful in deciding the issue before the court.

11    My response to Mr. Weis is that if I'm permitted to allow

12 these articles to be a part of the record and he wants to submit

13 articles that rebut those articles, I don't object to that, Your

14 Honor.  This could go on forever, as I'm sure the court would

15 agree, but I don't have an objection to him submitting articles

16 that rebut or present evidence contrary to the articles that are

17 already a part of the record.

18    MR. WEIS:  This may now be moot.  My recollection of

19 what occurred at the last hearing is somewhat different.  I

20 recall that I would not agree, without seeing first, articles

21 which might be found in the future.

22    I say it may be moot because the government's response is

23 one of the two I suggested.  If the court is of a mind to admit

24 the two articles to which I objected and is willing to have me

25 submit articles in rebuttal, I'm willing to do that.  I would

```
 1   like two weeks because these articles often tend to be quite
 2   long, and, as I said, I don't like to cite things I haven't
 3   read.
 4           MS. JOHNSTON:  Your Honor, I would like permission
 5   to -- not only the ones -- I mean, the ones that he objected to
 6   as well should be part of the record, not just the one he didn't
 7   object to.  So, in my notes from the last hearing, I would just
 8   say that this court said there appeared to be other pertinent
 9   studies out there that the court may take into consideration,
10   and I thought that's what the court said at the time.
11           THE COURT:  Thank you.
12      The court will receive the three articles suggested by the
13   government, the titles of which have been referred to by
14   Mr. Weis here today, and the court will also permit Mr. Weis two
15   weeks in which to submit articles in rebuttal.
16      In addition, the court proposes to take judicial notice of
17   three other articles as follows:  Susan B. Sorenson and Douglas
18   J. Wiebe, entitled *Weapons in the Lives of Battered Women*, 94
19   Am. J. Public Health 1412, the year is 2004; Franklin E.
20   Zimring, entitled *Firearms, Violence, and the Potential Impact*
21   *of Firearms Control*, at 32 J.L. Med. & Ethics 34, the year is
22   2004; Douglas J. Wiebe, *Homicide and Suicide Risks Associated*
23   *with Firearms in the Home:  A National Case-Control Study*, found
24   at 41 Annals of Emergency Medicine 771, in the year 2003; Bureau
25   of Justice Statistics, James Alan Fox and Marianne W. Zawitz,
```

1  entitled *Homicide Trends in the United States*, year 2011.

2      And, Mr. Weis, you may review those as well and respond to

3  them if you wish.

4          MR. WEIS:  Your Honor, I would like to review them, and

5  unfortunately I don't write quickly enough --

6          THE COURT:  I don't expect you to have all that, but in

7  Ms. Steinke's spare time, she will get you out that list.

8      I tell you what might be simpler to do is for me to just

9  give you what I just read from, and that would contain the list

10  and would save Ms. Steinke having to bother with it.

11         MR. WEIS:  I'd be happy to make copies for Ms. Johnston

12  if she would like it also.

13         MS. JOHNSTON:  Thank you, Your Honor.

14         THE COURT:  So we'll handle it that way.

15     And I would ask whether or not there is anything further

16  that needs to be added to the record of the case.

17         MR. WEIS:  Not on behalf of Mr. Chester, Your Honor.

18         MS. JOHNSTON:  Not on behalf of the United States, Your

19  Honor.

20         THE COURT:  And the timing on this now for these added

21  articles, how much time do you want, Mr. Weis?

22         MR. WEIS:  What I would propose that both parties have

23  leave to submit rebuttal articles, limited to rebuttal articles

24  by the end of the first week of August, taking into account what

25  Ms. Johnston has told me about her vacation.

1          THE COURT:  The end of the first week in August is

2    something like August 6th or 7th.

3          MR. WEIS:  I thought it was the 5th.  It's the 5th or

4    6th.

5          THE COURT:  Wait just a moment.  I've got it right

6    here.  It is Friday, the 5th, would be the end of the first

7    week.  And so, if you furnish that, then I take it that

8    Ms. Johnston can file something, if she wants, in response to

9    yours within some period after that.  What should it be?

10         MS. JOHNSTON:  I think a week would be fair, Your

11   Honor.

12         THE COURT:  So that would be August 12th?

13         MS. JOHNSTON:  That's fine, Your Honor.

14         MR. WEIS:  That's fine with me, Your Honor.

15         THE COURT:  And so, it will be so understood.

16         MR. WEIS:  And my understanding is these are limited to

17   rebuttal articles.  I don't want to be in the position of asking

18   to be able to submit more rebuttal to hers, so that we should

19   keep the scope narrow.

20         MS. JOHNSTON:  I have no objection to that.

21         THE COURT:  My guess is that we'll be so weary by the

22   time you get to that point, that we won't want to add anything

23   else.

24         MR. WEIS:  Well, I have a deadline of August 31st.

25         THE COURT:  I understand that, so whatever we do has to

1    be done within that time frame, unless, of course, you decide to

2    stay.  So we're still working on that.

3              MR. WEIS:  That's the first I've heard officially.

4              THE COURT:  Pardon me?

5              MR. WEIS:  That's the first I heard officially, Your

6    Honor.

7              THE COURT:  Anything further this evening?

8              MS. JOHNSTON:  No, Your Honor.

9              MR. WEIS:  No, Your Honor.

10             MS. JOHNSTON:  Thank you.

11             THE COURT:  Thank you.

12         (At 5:40 p.m. the hearing was concluded.)

13                          --oOo--

14                  REPORTER'S CERTIFICATE

15       I, Barbara Steinke, Registered Merit Reporter, do hereby
     certify that the foregoing proceedings were reduced to writing
16   by me at the time and place therein mentioned, and said
     proceedings are a true and accurate transcript from my notes.
17   Quoted material in this transcript is verbatim and may/may not
     reflect a direct quote.  I further certify that I am neither
18   related to any of the parties by blood or marriage, nor do I
     have any interest in the outcome of the above matter.

19

20   March 19, 2012              s/Barbara Steinke

21

22

23

24

25

United States v. William Chester                    94

1                              **INDEX**

2  **WITNESSES CALLED ON BEHALF OF THE UNITED STATES:**

3  **Linda Guerrant**
       Direct By Ms. Johnston ....................................... 28
4      Cross By Mr. Weis ........................................... 38
       Redirect By Ms. Johnston .................................... 54
5      Recross By Mr. WEIS ......................................... 58

6  **Meghan Chester**
       Direct By Ms. Johnston ...................................... 63
7      Cross By Mr. Weis ........................................... 68

8  **WITNESSES CALLED ON BEHALF OF THE DEFENDANT:**

9  **Mildred DeVore**
       Direct By Mr. Weis .......................................... 73
10     Cross By Ms. Johnston ....................................... 74

11 **Fran Jackson**
       Direct By Mr. Weis .......................................... 75
12     Cross By Ms. Johnston ....................................... 79
       Redirect By Mr. Weis ........................................ 82

13

14  **EXHIBITS ADMITTED IN EVIDENCE:**

15  Court 1   Written statement of Meghan Chester              20

16  Court 2   Photographs                                      25

17  Govt 1    Handwritten note                                 58

18  Deft 2    Transcript of grand jury testimony of            49
            Linda Guerrant

19

20

21

22

23

24

25