```
 1                 IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF WEST VIRGINIA
 2                            AT CHARLESTON

 3   -------------------------------x
                                     :
 4   UNITED STATES OF AMERICA,       :
                                     :
 5        v.                         :  CRIMINAL NO. 2:08-00105
                                     :
 6   WILLIAM CHESTER, JR.,           :  DECEMBER 22, 2011
                                     :
 7             Defendant.            :
     -------------------------------x
 8

 9                     TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE JOHN T. COPENHAVER, JR.
10                   UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   FOR THE UNITED STATES:      AUSA LISA JOHNSTON
                                 U.S. Attorney's Office
13                               P.O. Box 1713
                                 Charleston, WV  25336
14

15   FOR THE DEFENDANT:          AFPD LEX A. COLEMAN
                                 Federal Public Defender's Office
16                               300 Virginia Street East
                                 Charleston, WV  25301
17

18

19   COURT REPORTER:             BARBARA STEINKE, RMR
                                 Post Office Box 75025
20                               Charleston, WV  25375
                                 (304) 347-3151
21

22   These proceedings were reported with use of a stenographic
     machine and transcribed with use of computer-aided
23   transcription.

24

25
```

```
 1                 P R O C E E D I N G S         10:04 a.m.
 2         THE CLERK:  The case before the court this morning is
 3  United States of America versus William Samuel Chester, Jr.,
 4  2:08-105, Criminal Action.  Would counsel please rise and note
 5  your appearances for the record.
 6         MS. JOHNSTON:  Lisa Johnston on behalf of the United
 7  States.
 8         THE COURT:  Thank you.
 9         MR. COLEMAN:  Lex Coleman on behalf of William Chester,
10  Your Honor, who is present to my right in the courtroom.
11         THE COURT:  Thank you.
12         MR. COLEMAN:  Thank you.
13         THE COURT:  This matter is scheduled today for the
14  purpose of considering the supplementation of the evidentiary
15  record in this action with the empirical evidence that was
16  garnered from social science studies and scholarly social
17  science reports found in the case opinion of the United States
18  Court of Appeals for the Fourth Circuit in United States versus
19  Staten to the extent that those studies are not already within
20  the evidentiary record in this case.
21     And at this time I would ask the government if it has any
22  further study or studies to present.
23         MS. JOHNSTON:  Yes, Your Honor, I do.  I would ask
24  permission from the court to add to the record in the Chester
25  case and it would be marked as government's exhibit number 16.
```

1   It's titled, "The Full Report of the Prevalence, Incidence, and
2   Consequences of Violence Against Women," and it is -- your
3   Honor, it's kind tricky in the sense that government's exhibit
4   that's already been introduced, number 3 in this particular
5   case, has a similar title, but I think that the exhibit that I
6   wish to introduce today as part of the record in the *Chester*
7   case is the full report and is actually cited in the recent
8   *Staten* opinion issued by the Fourth Circuit.
9       And I have provided Mr. Coleman with a copy of this new
10  exhibit.  In light of that, Your Honor, I think what the
11  government has done is we have gone through the *Staten* brief,
12  the *Staten* record, and as well as the new Fourth Circuit
13  opinion, and we have tried to compare it with what has been
14  introduced in the *Chester* case, and I believe, I hope, that this
15  is the only additional report that I'll need to provide in this
16  particular case, Your Honor.
17          THE COURT:  As I understand it, the other reports that
18  are referred to in the *Staten* opinion are already fully in the
19  record in this case.
20          MS. JOHNSTON:  Yes, Your Honor.
21          THE COURT:  And so, that's the lone addition, is simply
22  a fuller report of an item that also is already in the record in
23  this case.
24          MS. JOHNSTON:  That's correct.
25          THE COURT:  Very good.

1       Any objection to the receipt in evidence of that single
2  item?
3       MR. COLEMAN:  Yes, sir, we do, and if I can explain.
4  Government exhibit 3, which I'll call the -- these reports, Your
5  Honor, are by the same authors --
6       THE COURT:  Yes, sir.
7       MR. COLEMAN:  -- and through the same organization.
8  I'll refer to the first as the July 2000 report and then there
9  was a November 2000 report.  The first was 55 pages, the second
10 was 52 -- or, excuse me, 72.  I know Mr. Weis objected
11 originally to government's exhibit 3 because it was a survey
12 report with a very small pool.  What they did in exhibit 3 was
13 take 8,000 men, 8,000 women, and do percentages on that for
14 incidents of domestic violence in the twelve-month preceding
15 period, and then turn around and extrapolate out of the blue to
16 1.5 to 2.8 million participants nationwide.  They called it a
17 nationwide sample.  They didn't really go into how they picked
18 the sample, the sample methodology, or how that could be a fair
19 predictor of anything, other than they asked people questions
20 over telephone calls.  They assumed the responses they got were
21 true.  There is no way to really verify any of that.
22     And, again, the extent of the whole report, I mean, this is
23 an election year.  We're seeing surveys -- we should be getting
24 surveys frequently, and this was something done in a typical
25 methodology of a survey which is limited in terms of its scope

1  and reliability.
2      They also did a statistical analysis.
3          THE COURT: Let me ask you. I'm just curious about one
4  thing you just stated. This report is July 2000?
5          MR. COLEMAN: The exhibit 3, government exhibit 3 is.
6  What Ms. Johnston is attempting to present, what she wants, is
7  November of 2000, and it's --
8          THE COURT: I understand. And you referred to it as
9  being in an election year.
10         MR. COLEMAN: No, I meant this year. We are in one
11 just to note that surveys are a common thing we see as citizens
12 in this country. They are -- I get calls at home about surveys
13 is the point I'm making. In terms of other just calling and
14 asking somebody a question, that's all really a survey amounts
15 to.
16         THE COURT: I'm trying to grasp the significance of the
17 election year comment. Is it that surveys of this sort are
18 historically made only in election years for political purposes?
19         MR. COLEMAN: No, sir. It was to suggest that as
20 citizens, we would be more exposed to surveys this year than we
21 may usually be in other years.
22         THE COURT: Please go ahead.
23         MR. COLEMAN: Yes, sir. The original survey, as well
24 as the new one the government wants to present, besides having
25 the limitations of a survey, fails to examine -- they both claim

1  to examine risk factors as to intimate partner and domestic
2  violence, but they don't include whether or not a gun was
3  involved.  They do not look into whether one was present in the
4  home and not involved.  They don't look at the impact or whether
5  there is any resort to domestic violence counseling.  In the
6  parts of the survey dealing with substance abuse, there is no
7  consideration or examination of substance abuse counseling and
8  the impact on recidivism.
9     The original survey instead just compared what people
10 narratively described as intimate partner victimization
11 violence.  And, again, I mentioned to you how they took a 1.5
12 percent out of 8,000 women and .9 percent out of 8,000 men, and
13 relying on a 1988 population growth estimate spun that up to 1.5
14 million women and almost 900,000 men being raped or physically
15 assaulted annually.  Those are the percentages cited on page 15
16 of the slip opinion for the *Staten* case and the quote referred
17 to on page 15, going over to page 16.
18     As far as the exhibit the government wants to introduce now,
19 it is mentioned on page 16 of *Staten,* but only with reference to
20 *George v. Randolph* and the general proposition that domestic
21 violence is a problem in the United States.
22     The new report or the full report added in a lot of
23 additional facts and considerations, whether people had been
24 abused as a child, whether they started fires.  They started
25 looking at things that are not even addressed by the statute

1  we're challenging.  It's still a survey, but in a lot of ways
2  it's going to the whole point Mr. Weis initially made, and I
3  reiterate, is that we need to be looking at the risk posed by
4  the individual under the statute rather than this survey
5  evidence.
6      *Staten* said the court could look to and the parties could
7  present scholarly works, but, again, this is just a statistical
8  analysis taken from a small sample, and then there are estimates
9  on top of estimates to draw some pretty broad demographic and
10 societal conclusions.  It is done by an organization with a
11 definite agenda and through an arm of research through the
12 Department of Justice.
13     They are all being presented as predictors of future
14 dangerousness.  Mr. Weis has already presented evidence,
15 arguments, studies and case briefs, amicus briefs submitted by
16 the American Psychiatric Association stating how -- the
17 impossibility of reliable predictions of future dangerousness
18 from a psychiatric standpoint.  And yet the studies the
19 government is offering are bypassing known disciplines and
20 social science and medical psychology, and is submitting studies
21 to you based merely on statistics.
22     Your Honor, in 1954, Darrell Huff wrote a book on how to lie
23 with statistics.  It is now one of the principal sources college
24 students and AP students in high school read before they take
25 advanced statistics classes.  This is number crunching with

1   really broad conclusions being drawn by small sampling pools.
2   To their credit, the reports do note areas where there are
3   differing studies, they do lay out some margins for errors, but
4   it's still very small pool statistics being offered to you as --
5   it's not an analytical scholarly study in looking at behavior,
6   medical insight into it.  It's merely collecting numbers and
7   trying to draw future inferences from it, which Mr. Chester's
8   own case submits are not particularly reliable.
9       So, I understand government's exhibit 3 is already in, but
10  we're opposing the further presentation of government's exhibit
11  16 for the reasons I've gone through this morning.
12      What is disheartening about all the statistics and what I
13  wish someone would do, if for no other reason than to lend
14  credibility to some of these studies, is look at the relative
15  rates of recidivism and danger with what they are trying to show
16  this is a serious problem, domestic violence.  That's been
17  accepted.  Is it so much more dangerous than other crimes that
18  do not result in permanent disarmament to justify overriding the
19  Second Amendment considerations is what somebody -- it would be
20  very helpful to develop, both for litigants and the courts, to
21  see if it is statistically so much more prevalent.
22      The majority of -- in the exhibit that's already in
23  evidence, 76 percent of what they identify from their small
24  pools didn't involve gunshot, didn't even involve a knife.  They
25  deal with that in another category in their report.  They

1 involve small bruises, scratches, or welts, things that were not
2 involved with a weapon.
3    So, it's an attempt to take a category of behavior through a
4 very narrow statistical study, state the obvious, it's a
5 problem, and use that to support laws that -- like the one at
6 issue in this case disarm people like Mr. Chester after they
7 have served a sentence and been convicted of something, and
8 subject them to further punishment for the rest of their lives.
9 Is that justified statistically, if they are going to go to
10 that, than all the other crimes, like brandishing, conceal
11 carry, other gun-related crimes that do not result in federal
12 criminal disarmament?  That's where statistical studies would be
13 very useful.  But so far, the only organizations that have
14 really prepared anything we have been able to find have been the
15 ones directly and specifically interested in women's violence.
16    And, again, there's not that big a pool of material, they
17 even say in the studies that it barely goes back twenty years
18 and we're short of it, that's part of why they claim they are
19 doing the research, but they do the research from such a small
20 pool and try to justify it by saying it's a national sample,
21 that it's really not as helpful as it otherwise could be if they
22 would adjust their examination parameters and widen their
23 sampling pool.
24    I mean, we -- and this goes back only to the election year,
25 Your Honor, because I'm hearing it on the news every morning

1 when I drive to work, we hear one or the other candidate in the
2 Republican primary is ahead by a certain percentage in Iowa, but
3 then we find out the sampling pool might have been 300 voters,
4 and all the commentators agree, that's not particularly reliable
5 in predicting the outcome when they have all the caucuses after
6 Christmas.  I submit the same problems are presented by these
7 type of statistical reports.  They are research, but they are
8 taken from such a small pool, they are not reliable enough to be
9 given weight and accepted as an exhibit in evidence in the
10 issues that are presented in this case.
11    Thank you.
12        THE COURT:  Thank you.
13    And Ms. Johnston?
14        MS. JOHNSTON:  Your Honor, just briefly.  I just would
15 submit that like the other social science reports and other
16 studies that have already been introduced and are part of the
17 record in this case, as the court has indicated, they are
18 pertinent to the issue before the court today.  I submit to the
19 court that the full report is pertinent to this court's ultimate
20 determination in this case.  And I trust that the court will
21 review the full report and give it whatever weight it deems
22 appropriate in this particular case.
23    And I say that, Your Honor, because I believe that this
24 court is capable of disregarding the other studies or any other
25 reports or information that's irrelevant to the specific issue

1   before the court. And I would just point the court to, in the
2   *Staten* opinion, Your Honor, the full report refers to pages 25
3   through 26 of that report. That's what the government believes
4   is pertinent, and would ask the court to direct its attention
5   specifically to those pages of the full report.
6       Thank you, Your Honor.
7           THE COURT: Thank you, Ms. Johnston.
8       Let me ask whether or not, Mr. Coleman, you have anything
9   further.
10          MR. COLEMAN: Your Honor, my previous arguments address
11  those two pages. I don't believe limiting the examination of
12  that helps, because, again, they go from their small pool and
13  chart on page 26 and extrapolate that over a lifetime to 22
14  million people.
15          THE COURT: To what, sir?
16          MR. COLEMAN: They extrapolate that over a lifetime to
17  22 million people, and then in over a year, to over a million.
18  There's a table in exhibit 9 on page 26 of that report, and
19  noting the previous infirmities I've mentioned. I don't dispute
20  that *Staten* cited the opinion in *Georgia v. Randolph*, but,
21  again, it was for the general proposition there's a problem. I
22  don't think there's a dispute there's a problem.
23      So, all my other arguments I submit would apply, despite her
24  reference.
25          THE COURT: Very good.

1      Let me ask whether or not the parties have anything further
2   to present with respect to this matter at this time.
3           MS. JOHNSTON:  Your Honor, I would just ask that I be
4   permitted at this time then to introduce that full report as the
5   government's exhibit number 16 or I could at least offer it at
6   this time and subject to the court's determination, but I do
7   have it for the court.
8           THE COURT:  Very good.
9      Anything further on that matter, Mr. Coleman?
10          MR. COLEMAN:  We don't have an objection to it being
11  marked, just to it being admitted.
12          THE COURT:  The court will direct that the exhibit be
13  marked as perhaps it already is.  Have you marked it yet?
14          MS. JOHNSTON:  I have not, Your Honor.  It would be
15  marked as government's exhibit number 16.
16          THE COURT:  If you would, please, and the clerk will do
17  so.
18          MS. JOHNSTON:  Thank you, Your Honor.
19          THE COURT:  And it may be admitted in evidence.
20          MS. JOHNSTON:  May I approach, Your Honor?
21          THE COURT:  Please.
22     Do the parties have anything further?
23          MS. JOHNSTON:  No, Your Honor.
24          MR. COLEMAN:  No, Your Honor.
25          THE COURT:  The court notes that it anticipates an

1  order in this matter to be entered by midweek, and will set this
2  case for sentencing on December 30th at 10:00 o'clock.
3          MR. COLEMAN:  Your Honor, if I may, I am going to be
4  out of state that week.  Could I ask, Your Honor, if it has it
5  available, if you would allow me if you would set it the
6  following week?
7          THE COURT:  Are you going to be out the entirety of
8  next week?
9          MR. COLEMAN:  Yes, sir.
10         THE COURT:  And I take it there's no one else in your
11 office who can handle this matter?
12         MR. COLEMAN:  No, sir.  Mr. Weis --
13         THE COURT:  Pardon?
14         MR. COLEMAN:  No, sir, there's not.
15         THE COURT:  The court instead will set it for the first
16 week in January, and I don't have that calendar.  It may be well
17 to get the calendar and see how it fits with the schedule of the
18 parties.
19     Let me ask whether or not 10:30 on Thursday, January 5th, is
20 a satisfactory date and hour.
21         MR. COLEMAN:  That's fine for us, Your Honor.
22         MS. JOHNSTON:  Your Honor, I do not have my calendar
23 with me, but I don't anticipate that being a problem.
24         THE COURT:  If it's a problem, could you call us back
25 before noon?

1          MS. JOHNSTON:  I will, Your Honor.

2          THE COURT:  Otherwise, we'll assume it's okay --

3          MS. JOHNSTON:  That's fine, Your Honor.

4          THE COURT:  -- and fix it then, as I mentioned, 10:30,

5    January 5.  Thank you.

6          MS. JOHNSTON:  Thank you.

7          MR. COLEMAN:  Thank you.

8       (At 10:25 a.m. the hearing was concluded.)

9                           --oOo--

10                     REPORTER'S CERTIFICATE

11      I, Barbara Steinke, Registered Merit Reporter, do hereby
     certify that the foregoing proceedings were reduced to writing
12   by me at the time and place therein mentioned, and said
     proceedings are a true and accurate transcript from my notes.
13   Quoted material in this transcript is verbatim and may/may not
     reflect a direct quote.  I further certify that I am neither
14   related to any of the parties by blood or marriage, nor do I
     have any interest in the outcome of the above matter.

15

16   March 19, 2012                s/Barbara Steinke

17

18

19

20

21

22

23

24

25